763 A.2d 1265 (2000)
STATE of New Jersey, Plaintiff-Respondent,
v.
Joel WILLIAMS, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued November 15, 2000.
Decided December 21, 2000.
*1266 Olivia Belfatto Crisp, Designated Counsel, argued the cause for appellant (Joel M. Harris, First Assistant Public Defender, attorney; Ms. Crisp, of counsel and on the brief).
Linda A. Shashoua, Assistant Prosecutor, argued the cause for respondent (Lee A. Solomon, Camden County Prosecutor, attorney; Ms. Shashoua, of counsel and on the brief).
Before Judges COBURN, AXELRAD and BILDER.
The opinion of the court was delivered by BILDER, J.A.D. (retired and temporarily assigned on recall).
Following a jury trial defendant Joel Williams was found guilty of conspiracy to distribute cocaine, N.J.S.A. 2C:5-2, (Count 1); possession of cocaine, N.J.S.A. 2C:35-10a(1) (Count 2); possession of cocaine with intent to distribute, N.J.S.A. 2C:35-5a(1) (Count 3); and possession of cocaine with intent to distribute within 1000 feet of school property, N.J.S.A. 2C:35-7 (Count 4). Counts 1, 2, and 3 were merged into count 4, possession of cocaine with intent to distribute within 1000 feet of school property, for which he was sentenced to a custodial term of four years with a minimum of three years. Appropriate fines, penalties, and driver's license suspension were imposed.
The convictions arose from a purchase of cocaine made in the course of a "buy-bust" operation by undercover investigators of the Camden County Prosecutor's office. Immediately upon the completion of the purchase, back-up officers arrived and arrested the men involved in the sale. The direct testimony of the investigators, corroborated by recovery of the marked money used for the purchase and the recovery of cocaine in the sellers'"stash", if believed by the jury, was sufficient to prove defendant's guilt beyond a reasonable doubt.
On appeal defendant makes the following contentions:
POINT I
THE COURT ERRED IN REFUSING TO GRANT DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL
*1267 POINT II
THE POLICE OFFICER'S TESTIMONY THAT THE DEFENDANTS WERE WORKING "TOGETHER" EXCEEDED THE BOUNDS OF PROPER LAY OPINION TESTIMONY AND EMBRACED THE ULTIMATE ISSUE OF DEFENDANT'S GUILT OR INNOCENCE ON THE CONSPIRACY CHARGE
POINT III
THE COURT ABUSED ITS DISCRETION IN SUBSTITUTING JUROR NUMBER TWO ABSENT COMPELLING CIRCUMSTANCES ONCE DELIBERATIONS HAD COMMENCED, THUS VIOLATING DEFENDANT'S RIGHT TO A FAIR TRIAL BY AN IMPARTIAL JURY (NOT RAISED BELOW)
POINT IV
THE SENTENCE WAS MANIFESTLY EXCESSIVE IN THAT DEFENDANT SHOULD HAVE RECEIVED THE MINIMUM PERIOD OF IMPRISONMENT FOR A THIRD DEGREE OFFENSE UNDER THE SCHOOL ZONE LAW

I.
The principal issue on this appeal is the propriety of removing a juror during, the course of deliberations and replacing him with an alternate. To understand the issue in context requires knowledge of the details of the State's version of the events that transpired at the time of the alleged drug transaction.
According to the investigators, they drove to a street corner and saw three men, later identified as defendant Williams and co-defendants Monroe McCloud and Noah Xavier[1], standing there, apparently engaged in a conversation. One of the investigators, Kee, made eye contact with McCloud and began to get out of the car. McCloud approached and told the driver to move away from the corner so as not to be so obvious. The car was moved and Kee began to walk toward Williams and Xavier. Xavier ran to an abandoned house. Williams told Kee where to stand and wait for Xavier. After a momentary delay Xavier came out of the house and waved for Kee to come in with him. After Kee was in the house and the door was closed, Xavier asked what he wanted. Kee said he wanted two "nicks" ($5 bags of cocaine). Xavier gave him two small bags, later proved to contain cocaine. Kee gave Xavier a marked $20 bill and received a $10 bill as change.
Kee returned to the car and once inside, keeping Williams, McCloud and Xavier in view, radioed to a back-up team. The team responded in less than forty-five seconds and took the three into custody. A short time later Kee drove back to the scene in another car with tinted windows and again identified the three men, verifying that the right men had been arrested.
At the time of trial, a little over two years later, Kee was unable to make any positive in-court identifications. He could only testify that he had a clear recollection of the event and the three who were arrested that day were the three who had engaged in the drug transaction two years before. There were some questions raised as to discrepancies between the descriptions of the three given to the back-up teams in the radio message and the appearance of Williams and McCloud at the trial[2]. As a result, identification of Williams and his co-defendant McCloud became an issue in the case, contested by both defense counsel in their summations. In his summation the Prosecutor characterized this as "the crux of the problem."
The jury commenced its deliberations on the fourth day of trial at 11:23 a.m. Some *1268 three hours later, at 2:20 p.m., the jury asked for a rereading of "Kee's description of the three people, Moore's [a member of the back-up team which arrested the three] description of the three people, [and] all of [defendant William's] testimony." Because the identification testimony was woven throughout the testimony of Kee and Moore, all of their testimony, as well as that of Williams, was read to the jury. See State v. Wilson, 165 N.J. 657, 762 A.2d 647 (2000). This was completed at 4:23 p.m. and in answer to a question from the judge, the jury expressed a desire to cease their deliberations for the day and return the next day. This decision led to the removal of a juror, the substitution of an alternate, and the issue presented by this appeal.
When the jury decided to return the next day, one of the jurors said he could not be in court the next day. This led to the following colloquy:
THE COURT: Okay. Who has the problem? All right, sir. Would you indicate why you do not feel you could return tomorrow to continue deliberations?
JUROR NUMBER 2: Well, I need to make some money this week. I thought this was only going to go maybe one, two days, I need to get back on track.
THE COURT: Well, I would suggest to you, sir, that probably applies to everybody on the jury.
JUROR NUMBER 2: I'm not getting paid for being here. I gave it my best shot. I stayed here for three days so far.
THE COURT: So you're saying you would have a hardship if you had to return here tomorrow?
JUROR NUMBER 2: Yes, sir.
THE COURT: Counsel, do you have any difficulty if this juror is excused?
[WILLIAM'S COUNSEL]: Judge, I leave it in your discretion.
THE COURT: Okay. It's discretionary with the Court, sir, I will grant your request so you are excused from further deliberations. We will now select an alternate juror who will take your spot.

II.
After a jury has commenced deliberations, R. 1:8-2(d)(1) permits the seating of an alternate juror "if ... a juror dies or is discharged by the court because of illness or other inability to continue." The Rule has been comprehensively examined and explained by Justice Stein in State v. Valenzuela, 136 N.J. 458, 643 A.2d 582 (1994). He noted the rule is employed sparingly and, quoting from State v. Lipsky, 164 N.J.Super. 39, 43, 395 A.2d 555 (App.Div. 1978), should "be invoked only as a last resort mechanism to avoid the deplorable waste of time, effort and money inherent in a mistrial." Id. at 468, 395 A.2d 555. In State v. Trent, 157 N.J.Super. 231, 384 A.2d 888 (App.Div.1978), rev'd on other grounds, 79 N.J. 251, 398 A.2d 1271 (1979), in language approved by Justice Stein, Valenzuela at 468, 643 A.2d 582, Judge Pressler said:
[The] "unable to continue" language of the rule must be strictly construed and must ordinarily be limited to compelling circumstances which are exclusively personal to the juror in question, and hence which do not and which by their nature cannot raise the specter of either a jury taint or a substantive interference with the ultimate course of the deliberations beyond that necessarily implicit in the effect of new personalities on group dynamics.

[Trent, supra, 157 N.J.Super. at 240, 384 A.2d 888.]
Facially, the circumstances which led to the removal of Juror Number 2 related exclusively to his personal situation. He had gone some three days without work and wanted to "make some money." While his situation was understandable, it was, as the trial judge observed, *1269 one which probably applied to many other members of the jury. We know from experience that this reason is often offered as a basis for excuse by potential jurors during voir dire and usually rejected. We can hardly find this excuse to rise to the dignity of a "compelling circumstance", an "inability to perform the duties of a juror", or an "inability to continue deliberations", terms woven into Justice Stein's examination of the R. 1:8-2(d)(1). Rather the reason bespeaks inconvenience or, at best, a hardship shared with most who have to sacrifice their time to meet the citizenship duties of jury service. While the colloquy with the juror speaks of "hardship", we note that the thought came from the judge by way of a leading question, not from the juror.
Because the jury had deliberated for about three hours, asked for extensive rereading directed at the identification issue, and were able to reach a verdict the next day by noon, we readily infer the substitution of the alternate came at a critical time in the jury's deliberative process. We cannot conclude with assurance that the trial judge did not interfere with that process. See Valenzuela, supra. at 473-474, 643 A.2d 582.
To ensure the jury's protection from interference on the part of the judge, the remedy of discharge and substitution during deliberations is permitted only in those instances where a juror falls ill or is otherwise unable to continue for strictly personal reasons.
[State v. Adams, 320 N.J.Super. 360, 727 A.2d 468 (App.Div.1999).]
Here there was neither illness nor an inability to continue. The removal was triggered by the juror's desire to terminate his jury duty and return to work. Although the juror's statement seems superficially described as inconvenience, the phrase "I gave it my best shot" bears an implication that the deliberative process itself may have been involved in his request to be excused. The removal was error and requires reversal.
We recognize that defendant's attorney acquiesced in the substitution of the alternate. However this action affected constitutional rights which cannot be readily waived. Errors related to juror substitution are cognizable as plain error. State v. Corsaro, 107 N.J. 339, 346, 526 A.2d 1046 (1987). They trench on rights fundamental to our criminal justice system. Id. at 346-347, 526 A.2d 1046.
Read narrowly Corsaro deals with the substitution of a juror after a partial verdict has been returned. However, this limited approach overlooks the reasoning behind the opinion and makes a distinction where there is no fundamental difference. The issue is, as Justice Handler pointed out, whether the deliberations had advanced to a stage where there was a collectivity and mutuality in the deliberations, whether the deliberations had progressed so far that the jury had reached determinations, whether the deliberations have advanced to the point where the substituted juror will arrive without the benefit of the deliberations of the rest and may be pressured by the amount of time already spent and the extent of their progress. Id. at 350-351, 526 A.2d 1046.
In Corsaro the substantial progress was clearly and objectively demonstrated by the partial verdicts. Here such substantial progress was clearly and objectively demonstrated when after three hours of deliberations the jury requested extensive readings of testimony relating to the identification of the defendant, the issue the prosecutor called "the crux of the case". To put these three hours in perspective, as we have already noted, three hours was about the time the reconstituted jury required to reach a verdictperhaps in light of the readings and the prior deliberations.
The practical problem involved in the substitution of a juror is perhaps best summed up in the Corsaro court's approval *1270 of the California Supreme Court's rationale.
The requirement that 12 persons reach a unanimous verdict is not met unless those 12 reach their consensus through deliberations which are the common experience of all of them. It is not enough that 12 jurors reach a unanimous verdict if 1 juror has not had the benefit of the deliberations of the other 11. Deliberations provide the jury with the opportunity to review the evidence in light of the perception and memory of each member. Equally important in shaping a member's viewpoint are the personal reactions and interactions as any individual juror attempts to persuade others to accept his or her viewpoint. The result is a balance easily upset if a new juror enters the decision-making process after the 11 others have commenced deliberations. The elements of number and unanimity combine to form an essential element of unity in the verdict. By this we mean that a defendant may not be convicted except by 12 jurors who have heard all the evidence and argument and who together have deliberated to unanimity.

[People v. Collins, 17 Cal.3d 687, 693, 131 Cal.Rptr. 782, 786, 552 P.2d 742, 746 (1976), quoted in Corsaro at 349-350, 526 A.2d 1046.]
Because the improper removal of the deliberating juror requires reversal, we do not consider defendant's remaining contentions.
Reversed and remanded for a new trial.
COBURN, J.A.D., dissenting.
Although the substitution of the juror was unwarranted under R. 1:8-2(d)(1) for the reasons stated by the majority, I cannot agree that the principles expressed in State v. Corsaro, 107 N.J. 339, 526 A.2d 1046 (1987), mandate reversal as a matter of plain error.
The Supreme Court was particularly concerned that "[t]o allow juror substitution at an advanced stage of deliberations would be to sanction a rift in the collectivity and mutuality of the jury's deliberations...." Id. at 350-51, 526 A.2d 1046. Addressing what it described as the "grey area between jury deliberations and determinations," id. at 351, 526 A.2d 1046, the Court said that the "concern was that if the jury deliberates for an extended period of time, it will have progressed so far in its deliberations that it will have reached determinations." Ibid. Referring to State v. Miller, 76 N.J. 392, 388 A.2d 218 (1978), and State v. Trent, 79 N.J. 251, 398 A.2d 1271 (1979), the Court went on to explain the considerations in detail:
What Miller and Trent contemplate and caution against, however, is the substitution of a juror in a situation where the presumption that jurors follow instructions is unreasonable or untenable. Thus, where the deliberative process has progressed for such a length of time or to such a degree that it is strongly inferable that the jury has made actual fact-findings or reached determinations of guilt or innocence, the new juror is likely to be confronted with closed or closing minds. In such a situation, it is unlikely that the new juror will have a fair opportunity to express his or her views and to persuade others. Similarly, the new juror may not have a realistic opportunity to understand and share completely in the deliberations that brought the other jurors to particular determinations, and may be forced to accept findings of fact upon which he or she has not fully deliberated.

[107 N.J. at 352, 526 A.2d 1046.]
In the subject case, the evidence of narcotics trafficking was overwhelming. The critical issue respecting defendant was his identification as a participant in the crimes. After three hours of deliberation, the jury asked for a reading of the testimony related to this issue that came from two officers and defendant Williams. The juror was substituted, with defense counsel's acquiescence, immediately after the *1271 reading. The judge then forcefully charged the jury respecting their responsibility to begin deliberations anew:
As you know, one of your members has now been excused from the jury, an alternate has been selected. Because of this change in your jury, you must set aside and disregard all your past deliberations and begin your deliberations again just as if you were now entering the jury room for the first time directly after listening to my charge. Beginning your deliberations again, you must eliminate any impact that the juror who is being excused may have had on your deliberations and consider the evidence in the context of full and complete deliberations with the new member of your jury.
The next day the jury deliberated for approximately three hours before returning guilty verdicts.
The majority concludes that in these circumstances it "can be inferred the substitution of the alternate came at a critical time in the jury's deliberative process." (Op. at 121, 763 A.2d at 1269.) More specifically, the majority finds that "substantial progress was clearly and objectively demonstrated when after three hours of deliberations the jury requested extensive readings of testimony relating to the identification of the defendant, the issue the prosecutor called `the crux of the case.'" (Op. at 122, 763 A.2d at 1269).
That conclusion strikes me as illogical and inconsistent with the rule laid down in Corsaro. While the period of deliberation was long enough to give some support for the majority's conclusion, the readback request was entirely inconsistent with a jury that had determined the critical issue of identification. Moreover, given the judge's clear and strong charge and the ensuing three hours of deliberation, I am satisfied that the deliberative process had not progressed to the point "that it is strongly inferable that the jury ha[d] made actual fact-findings or reached determinations of guilt or innocence...." 107 N.J. at 352, 526 A.2d 1046 (emphasis added.) Quite the contrary, the central issue obviously remained undetermined.
In Corsaro, the Court was willing to entertain the question as a matter of plain error in part because of the "evident good faith of [defense] counsel." Id. at 348, 526 A.2d 1046. The Court observed, "[t]he transcripts reflect not guile in inducing error, but confusion in ascertaining the proper course to take." Id. at 347, 526 A.2d 1046. There was no such confusion in this case. Defense counsel was simply confronted with an undecided jury and a juror whose desire to get back to work might undercut his full and active participation in the deliberations. If the juror was leaning toward conviction, his presence was not helpful. If he was leaning toward acquittal, his desire to leave might well deter him from battling for his position. Although the record does not expressly demonstrate "guile," I would be inclined to assume that the attorney was familiar with Corsaro and the possibility that it might be applicable to this case even if he consented to removal of the juror. Given the circumstances and the lack of evident good faith, I would not consider the matter as plain error.
Since I am satisfied that the other arguments raised by defendant, points I, II, and IV, are without sufficient merit to warrant discussion in a written opinion, R. 2:11-3(e)(2), I would affirm the judgment of conviction.
NOTES
[1] Although named as a co-defendant in the indictment, Xavier was not involved in the trial.
[2] For example Williams had been described as light or medium skinned but contended through counsel he was dark skinned.