793 A.2d 594

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. JOEL
WILLIAMS, A/K/A JOHN SNOWE AND JOEL DERRICK
WILLIAMS, DEFENDANT–RESPONDENT.

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. MONROE
MCCLOUD, A/K/A TONY/MANNY MCCLOUD, DEFENDANT–
RESPONDENT.

Argued November 26, 2001—Decided March 18, 2002.

154

*Linda A. Shashoua,* Assistant Prosecutor, argued the cause for appellant (*Lee A. Solomon,* Camden County Prosecutor, attorney).

*Robert L. Sloan,* Assistant Deputy Public Defender, argued the cause for respondent Joel Williams (*Peter A. Garcia,* Acting Public Defender, attorney).

*Ruth Bove Carlucci,* Assistant Deputy Public Defender, argued the cause for respondent Monroe McCloud (*Peter A. Garcia,* Acting Public Defender, attorney).

*Wendy Alice Way,* Deputy Attorney General, argued the cause for *amicus curiae,* Attorney General of New Jersey (*John J. Farmer, Jr.,* Attorney General, attorney).

The opinion of the Court was delivered by

LaVECCHIA, J.

This appeal presents the Court with the opportunity to determine whether financial hardship can rise to the level of an "inability to continue" under *Rule* 1:8–2(d) to justify the excusal of a deliberating juror. Because we answer that question in the affirmative, we are called on to address whether the trial court committed plain error by exercising its discretion in this matter to excuse a deliberating juror on that asserted ground. We hold that the trial court did not abuse its discretion, and that its actions did not amount to plain error. Accordingly, the determination of the Appellate Division is reversed.

I.

On January 23, 1996, defendants Joel Williams and Monroe McCloud were arrested in the City of Camden after selling drugs to undercover police officers. Defendants were indicted on four counts: (1) third degree conspiracy, in violation of *N.J.S.A.* 2C:5–2

(Count One); (2) third degree possession of a controlled dangerous substance, in violation of *N.J.S.A.* 2C:35–10a (Count Two); (3) third degree possession with the intent to distribute a controlled dangerous substance, in violation of *N.J.S.A.* 2C:35–5a(1) and *N.J.S.A.* 2C:35–5b(3) (Count Three); and (4) third degree possession of a controlled dangerous substance with intent to distribute within one thousand feet of a school zone, in violation of *N.J.S.A.* 2C:35–7 (Count Four).

Defendants were tried jointly and the following facts were adduced. On January 23, 1996, at 2:20 p.m., Investigators Jerome Alan Kee and William Gonzalez were working undercover near Seventh Street and Woodlynne Avenue in Camden. The officers were engaged in an undercover "buy-bust" operation. During a "buy-bust" operation an officer purchases drugs from a "drug corner" and then calls a backup unit to make an arrest based on a description of the suspect. Once the backup unit detains the suspect, the "purchasing" officer makes an identification.

Investigators Kee and Gonzalez drove to the intersection of Seventh Street and Woodlynne Avenue and observed three men standing on the corner engaged in conversation. Kee made eye contact with one of the men, later identified as defendant Monroe McCloud. As Kee exited the vehicle, McCloud approached the officers' vehicle and explained that they had to move the automobile from its location because police were in the area and they appeared "too obvious." While Gonzalez moved the vehicle, Kee walked toward the other two individuals. He observed the shorter of the two, later identified as Noah Xavier, run into a nearby abandoned house. Defendant Williams instructed Kee to stand and wait for Xavier. Xavier then emerged from the abandoned house and signaled Kee to join him inside.

Once inside, Xavier asked Kee what he wanted and Kee responded "two nicks." "Two nicks" are five dollar bags of cocaine. Xavier gave Kee the drugs in exchange for a twenty dollar bill. Kee left after he received his change and proceeded to the

investigators' vehicle. He observed McCloud and Williams on the corner.

As Kee approached the vehicle, he signaled to Gonzalez that he made a legitimate "buy." Gonzalez radioed the backup units and Kee relayed their location and a description of the suspects. Kee testified that forty-five seconds transpired between the drug purchase and the arrival of the backup team. The backup team took three individuals into custody.

Defendants' attorneys raised discrepancies between the description of the three suspects' skin tones given to the backup team in the radio transmission and the appearances of Williams and McCloud at trial. Further, Kee could not provide a positive in-court identification of defendants due to a two-year time lapse between the arrests and trial. Nonetheless, Kee testified that the three men he identified were the same three taken into custody by the backup team. Gonzalez corroborated Kee's testimony. The parties also stipulated that fingerprints taken of defendants on the day of the arrests matched the fingerprints of defendants at the time of trial.

Investigator Jeffery Moore testified that on January 23, 1996, he too participated in the "buy-bust" operation as a member of the backup arrest team. After his team arrested the three individuals, Investigators Kee and Gonzalez conducted a "ride-by" identification procedure whereby they identified the three men taken into custody as those involved in the drug sale. Investigator Charles Farrell also testified that he participated in the January 23, 1996, "buy-bust" operation. Farrell testified that he apprehended the men described by the undercover officers.

Defendant Williams testified that on January 23, 1996, he was returning home from his sister's house. As he walked down the street, he saw four individuals standing on the corner of Seventh Street and Woodlynne Avenue. Williams observed McCloud talking to Xavier and approached them. As the three discussed automobile parts, several officers suddenly appeared and arrested

them. Williams denied that he witnessed or participated in any drug transactions.

At the close of the evidence, the court charged the jury and sent them to deliberate. The jury deliberated for approximately three hours before requesting a readback of Investigators Kee and Moore's descriptions of the three suspects, and that of defendant Williams' entire examination. At the conclusion of the readbacks, the trial court asked the jury whether it wished to continue its deliberations or reconvene the following day. The jury decided to return the next day; however, Juror Number Two indicated to the court that he could not return. Outside the presence of the jury, the trial court explained to the parties:

[O]ne juror has indicated that, I don't know what the reason is but they cannot be here tomorrow, I don't know whether the excuse is a good one or a poor one or somewhere in between[,] but assuming the Court determines that it is a valid excuse for not being here, based on your positions as far as how we go about selecting an alternate, I'm going to make the determination because nobody can point me to any authority right at the moment that we will draw from the box among the two and whoever is drawn will be the replacement juror, okay?

Defendants' attorneys agreed to the substitution procedure.

The court then reconvened the jury and the following colloquy occurred between the trial court and Juror Number Two.

Court: Who has the problem? All right, sir. Would you indicate why you do not feel you could return tomorrow to continue deliberations.

Juror Number Two: Well, I need to make some money this week. I thought this was only going to go maybe one, two days, I need to get back on track.

Court: Well, I would suggest to you, sir, that probably applies to everyone on the jury.

Juror Number Two: I'm not getting paid for being here. I gave it my best shot. I stayed here for three days so far.

Court: So you're saying you would have a hardship if you had to return here tomorrow?

Juror Number Two: Yes, sir.

Court: Counsel, do you have any difficulty if this juror is excused?

Defense Counsel: Judge, I leave it to your discretion.

Court: Okay. It's discretionary with the Court, sir, I will grant your request so you are excused from further deliberations. We will select an alternate juror who will take your spot.

The court then excused Juror Number Two, and addressed the remaining members of the jury once again before releasing them for the day:

One final thing before your leave for the evening, folks. As you know, one of your members has been excused from the jury, an alternate has been selected. Because of this change in your jury, you must set aside and disregard all your past deliberations and begin your deliberations again just as if you were now entering the jury room for the first time directly after listening to my charge. Beginning your deliberations again, you must eliminate any impact that the juror who is being excused may have had on your deliberations and consider the evidence in the context of full and complete deliberations with the new member of your jury. That's my final comment.... [W]hen you return tomorrow, you will not be brought back into the courtroom, you will return directly to your deliberating room to begin your deliberations....

The next morning, the jury deliberated for approximately three hours before returning guilty verdicts against both defendants. The jury was polled, confirming that the verdicts were unanimous.

Defendants Williams and McCloud were sentenced on November 20, 1998. The trial court merged Counts One, Two, and Three with Count Four and sentenced defendant Williams to a four-year term, with a three-year parole disqualifier. The appropriate fines, penalties, and driver's license suspension were imposed. In respect of defendant McCloud, the trial court again merged Counts One, Two, and Three with Count Four and imposed a persistent-offender mandatory term of ten years, with a five-year parole disqualifier. Appropriate fines, penalties, and driver's license suspension also were imposed.

Defendants appealed and the Appellate Division reversed the convictions, reasoning that the trial court erred by improperly removing a deliberating juror. 336 *N.J.Super.* 115, 123, 763 *A.*2d 1265 (2000). A majority of the panel noted that the reason for excusal offered by Juror Number Two is frequently raised during *voir dire* and rejected. *Id.* at 121, 763 *A.*2d 1265. Specifically, the majority held that Juror Number Two's excuse did not rise to the level of a "compelling circumstance," an "inability to perform the duties of a juror," or an "inability to continue deliberations." *Ibid.* Although the panel acknowledged that the trial court's colloquy with the juror spoke of "hardship," the hardship circum-

stance was extracted by the judge through a leading question. *Ibid.* Further, the panel also was prompted to reverse because the substitution of the alternate came at a critical time in the jury's deliberative process. *Ibid.* The panel opined that the juror's statement that he "gave it [his] best shot" signified that the "deliberative process itself" was implicated in his request to be excused. *Id.* at 121–22, 763 *A.*2d 1265. Although defense counsel acquiesced in the substitution of the alternate, the panel determined that the substitution was plain error. *Id.* at 122, 763 *A.*2d 1265.

Judge Coburn dissented, concluding that although the substitution of Juror Number Two was unwarranted under *Rule* 1:8–2(d)(1), the excusal of the juror and the substitution of an alternate was not plain error. *Id.* at 123, 763 *A.*2d 1265. The dissent also disagreed with the majority's finding that the substitution came at a critical time in the jury's deliberative process. *Id.* at 124–25, 763 *A.*2d 1265. Specifically, the dissent maintained that the readback request was entirely inconsistent with the conclusion that the jury had determined the critical issue of identification. *Id.* at 125, 763 *A.*2d 1265. The dissent reasoned that the deliberative process had not progressed to the point where "it [was] strongly inferable that the jury ha[d] made actual fact-findings or reache[d] determinations of guilt or innocence," noting that the court gave a "clear and strong" charge regarding the substitution and the jury deliberated for three hours after the substitution before rendering a verdict. *Ibid.*

In addition to those matters before the Court because of the dissent below, we also granted certification, *State v. Williams,* 169 *N.J.* 604, 782 *A.*2d 422 (2001) and *State v. McCloud,* 169 *N.J.* 604, 782 *A.*2d 422 (2001), to consider the trial court's discharge and substitution of a deliberating juror for financial hardship under the "inability to continue" standard of *Rule* 1:8–2(d)(1).

## II.

 *Rule* 1:8–2(d)(1) governs the impaneling of additional jurors and the discharge and substitution of jurors. *State v.*

*Valenzuela,* 136 *N.J.* 458, 467, 643 *A.2d* 582 (1994). The rule permits a trial court to substitute an alternate juror for a regular juror after deliberations have begun because of death, illness, or "other inability to continue." *Rule* 1:8–2(d) states, in pertinent part:

> The court in its discretion may direct the impanelling [sic] of a jury of such number as it deems necessary to ensure that a sufficient number of jurors will remain to deliberate.... All the jurors shall sit and hear the case, but the court for good cause shown may excuse any of them from service provided the number of jurors is not reduced to less than 12 or 6 as the case may be or such other number as may be stipulated to. If more than such number are left on the jury at the conclusion of the court's charge, the clerk of the court in the jury's presence shall randomly draw such number of names as will reduce the jury to the number required to determine the issues. Following the drawing of the names of jurors to determine the issues, the court may in its discretion order that the alternate jurors not be discharged, in which event the alternate jurors shall be sequestered apart from the other jurors and shall be subject to the same orders and instructions of the court, with respect to sequestration and other matters, as the other jurors. If the alternate jurors are not discharged and if at any time after submission of the case to the jury, *a juror dies or is discharged by the court because of illness or other inability to continue,* the court may direct the clerk to draw the name of an alternate juror to take the place of the juror who is deceased or discharged. When such a substitution of an alternate juror is made, the court shall instruct the jury to recommence deliberations and shall give the jury such other supplemental instructions as may be appropriate.
>
> [(emphasis added).]

Substitution of an alternate juror during deliberation does not in and of itself offend a defendant's constitutional guarantee of a trial by jury. *State v. Miller,* 76 *N.J.* 392, 406–07, 388 *A.2d* 218 (1978). However, sparing use of the rule is counselled. *Valenzuela, supra,* 136 *N.J.* at 467–68, 643 *A.2d* 582. *See also State v. Hightower,* 146 *N.J.* 239, 253, 680 *A.2d* 649 (1996) (explaining that notwithstanding rule's broad language trial courts do not have unbridled discretion). "Because juror substitution poses a clear potential for prejudicing the integrity of the jury's deliberative process, it should be invoked only as a last resort to avoid the deplorable waste of time, effort, money, and judicial resources inherent in a mistrial." *Hightower, supra,* 146 *N.J.* at 254, 680 *A.2d* 649 (citing *State v. Lipsky,* 164 *N.J.Super.* 39, 43, 395 *A.2d* 555 (App.Div.1978)); *State v. Trent,* 157 *N.J.Super.* 231, 239, 384

*A.*2d 888 (1978), *rev'd on other grounds,* 79 *N.J.* 251, 398 *A.*2d 1271 (1979) (explaining that standard of "inability to continue" is considerably more narrow than concept of good cause to discharge prospective juror). At the heart of jury deliberations is a joint or collective exchange of views among individual jurors. It is therefore necessary to structure a process and create an environment that fosters and preserves that exchange until the jury reaches a final determination. *State v. Corsaro,* 107 *N.J.* 339, 349, 526 *A.*2d 1046 (1987). The reconstitution of a jury by substitution of an alternate juror in the course of jury deliberations can destroy the mutuality of those deliberations. *Ibid.See also Hightower, supra,* 146 *N.J.* at 253, 680 *A.*2d 649 (noting that frequent reconstitution of deliberating juries threatens integrity and mutuality of deliberations, thereby depriving defendants of right to fair trial by impartial jury).

■ Because of the concerns surrounding the impaneling of an alternate juror after deliberations have commenced, discharge of a deliberating juror is permitted only for reasons that are personal to the juror and that do not relate to the juror's interaction with the other jurors or with the case itself. *Valenzuela, supra,* 136 *N.J.* at 468, 643 *A.*2d 582. *See also Trent, supra,* 157 *N.J.Super.* at 239, 384 *A.*2d 888 (explaining that circumstances mandating substitution of juror under inability to continue standard are those which "are ordinarily not circumstances having the capacity to affect the substance or course of the deliberations"); *State v. Paige,* 256 *N.J.Super.* 362, 380–81, 607 *A.*2d 164 (App.Div.), *certif. denied,* 130 *N.J.* 17, 611 *A.*2d 655 (1992) (holding that trial court cannot discharge juror merely because juror is at odds with rest of jury).

■ Although the "death" and "illness" standards are narrow, the "inability-to-continue" standard has been acknowledged to be somewhat vague and broad; accordingly, the Court has construed and applied it narrowly. *Hightower, supra,* 146 *N.J.* at 254, 680 *A.*2d 649 (citing *Valenzuela, supra,* 136 *N.J.* at 468, 643 *A.*2d 582);

*Trent, supra,* 157 *N.J.Super.* at 240, 384 *A.*2d 888. To remove a juror under that standard

> *the record [must] adequately establish* [ ] that the juror suffers from an inability to function that is personal and unrelated to the juror's interaction with the other jury members. If a court suspects that the problems with the juror are due to interactions with other jurors, the court should instruct the jury to resume deliberations.
>
> [*Hightower, supra,* 146 *N.J.* at 254, 680 *A.*2d 649 (citing *Valenzuela, supra,* 136 *N.J.* at 472–73, 643 *A.*2d 582) (emphasis added).]

Thus, "inability to continue" has been invoked to remove a juror under circumstances that reveal that the juror's emotional condition renders him or her unable to render a fair verdict. *Hightower, supra,* 146 *N.J.* at 255, 680 *A.*2d 649. *See e.g., Miller, supra,* 76 *N.J.* at 406–07, 388 *A.*2d 218 (upholding substitution where juror's nervous and emotional condition rendered him unable to reach fair verdict); *Trent, supra,* 157 *N.J.Super.* at 240, 384 *A.*2d 888 (finding removal proper where juror suffered severe emotional and physical distress). Arguably, however, in those instances the inability to continue standard overlapped with the "illness" consideration permitted by the rule.

 The question squarely presented here is whether a claim of financial hardship falls within the "inability to continue" standard set forth in *Rule* 1:8–2(d). When the issue of financial hardship is brought into focus at an early stage of a criminal proceeding, the balancing of interests allows greater flexibility favoring the prospective juror with the asserted hardship. Courts have had no difficulty recognizing that a prospective juror may be excused for financial hardship. *Thiel v. Southern Pacific Co.,* 328 *U.S.* 217, 224, 66 *S.Ct.* 984, 987, 90 *L.Ed.* 1181, 1186 (1946) (recognizing authority of court to excuse daily wage earner from prospective jury service on individualized showing of undue financial hardship); *State v. Biegenwald,* 106 *N.J.* 13, 30, 524 *A.*2d 130 (1987) (holding that trial court can excuse prospective juror for financial hardship); *People v. Reese,* 670 P.2d 11, 12, 14 (Colo.Ct. App.1983) (explaining that court has discretion to excuse for cause juror who would not be paid her salary during jury service on basis of undue financial burden). *See also State v. Marcus,* 294

*N.J.Super.* 267, 274, 683 *A.*2d 221 (App.Div.1996), *certif. denied,* 157 *N.J.* 543, 724 *A.*2d 803 (1998) (rejecting defendant's claim of trial court error for dismissing sworn juror for financial hardship).

■ The financial realities of jury service require that courts have the discretion to excuse a juror on the basis of financial hardship.

Jurors are paid between four and fifty dollars per day of jury service, depending on the State. Some employers may pay employees who are on jury duty for a couple of weeks; unfortunately, many employers do not. Jurors who are self-employed or who work for commissions or tips suffer a serious financial loss as a result of serving on a jury. People with childcare responsibilities are likely to ask to be excused for the simple reason that the cost of hiring someone else to perform childcare may be prohibitive in comparison with the juror compensation rate. Most judges therefore excuse people who will suffer financial hardship or who have family responsibilities at home.

[Richard K. Willard, *What is Wrong With American Juries and How to Fix it,* 20 *Harv. J.L. & Pub. Pol'y* 483, 486–87 (1997).]

*See also* Joanna Sobol, *Hardship Excuses and Occupational Exemptions: The Impairment of the Fair Cross–Section of the Community,* 69 *S. Cal. L.Rev.* 155, 166 (1995) (acknowledging that financial hardship can occur when employer will not pay employee's salary during jury service); *Silagy v. State,* 101 *N.J.Super.* 455, 461, 244 *A.*2d 542 (Co.Ct.Law.Div.1968), *aff'd,* 105 *N.J.Super.* 507, 253 *A.*2d 478 (App.Div.), *certif. denied,* 54 *N.J.* 506, 257 *A.*2d 106 (1969) (recognizing financial hardship on jurors who are not paid during jury service).

Although the question is closer when considering whether financial hardship can justify the discharge of a deliberating juror under *Rule* 1:8–2(d)(1), other courts have permitted a sitting or deliberating juror to be dismissed for financial reasons. For instance, in *People v. Mickey,* 54 Cal.3d 612, 286 Cal.Rptr. 801, 818 P.2d 84 (1991), *cert. denied,* 506 *U.S.* 819, 113 *S.Ct.* 65, 121 *L.Ed.*2d 32 (1992), the defendant challenged, among other things, the trial court's excusal of a juror for hardship after the jury was sworn. *Id.* at 108–09. In affirming the defendant's conviction, the Supreme Court of California rejected the defendant's claim on procedural grounds because the defendant failed to object below

to the juror's discharge; it also commented *in dicta* that were it to reach the merits, it would reject the argument. *Id.* at 109. The court acknowledged the trial court's authority to excuse a person for undue hardship and commented that the exercise of that authority is reviewed under an abuse of discretion standard. *Ibid.*

Recently in *People v. Earp,* 20 Cal.4th 826, 85 Cal.Rptr.2d 857, 978 P.2d 15 (1999), *cert. denied,* 529 *U.S.* 1005, 120 *S.Ct.* 1272, 146 *L.Ed.*2d 221 (2000), the California Court had occasion to examine the issue of juror financial hardship under a "good cause" standard as embodied in that State's rule. *Id.* at 57–58. In *Earp,* the defendant argued that the trial court erred when it discharged a juror during the penalty phase of deliberations. *Id.* at 57. After the jury had deliberated for approximately a day and a half, a juror asked to be excused from further service because her employer had stopped paying her salary during her period of jury service and she already had to resort to the use of vacation time while continuing on the jury. *Ibid.* When asked whether it would be a hardship for her to continue her service, the juror replied, "I would either have to take vacation or not get paid." *Ibid.* Over the defendant's objection, the trial court excused the juror for financial hardship, selected an alternate, and instructed the jury to deliberate anew. *Ibid.* California's high court upheld the trial court's action under an abuse of discretion standard of review. *Id.* at 58.

More closely analogous to our question is the decision in *United States v. Echavarria–Olarte,* 904 F.2d 1391 (9th Cir.1990), where the Ninth Circuit Court of Appeals determined that reversible error would not be found where a trial court dismissed a sworn juror on the basis of a financial hardship. *Id.* at 1394–95. The court observed the difficulty of discerning whether a juror claiming financial hardship is "unable . . . to perform [his] duties" under the *Federal Rule of Criminal Procedure* 24(c) standard, noting that the determination is particularly suited to the exercise of discretion by trial court. *Id.* at 1395. *Cf. People v. Bunch,* 278 A.D.2d 501, 717 N.Y.S.2d 385, 386–87 (2000) (affirming trial court

where on second day of jury deliberations juror informed court "she felt pressure to return to her ailing computer business[,]" but trial court after thorough inquiry found juror not "unavailable to continue service[,]" and noting that as general rule, mere assertion of any financial hardship, standing alone, is not sufficient to warrant discharge from jury service).

## III.

### A.

We hold that the "inability to continue" standard of *Rule* 1:8–2(d) may be met by a determination of financial hardship. To be sure, the financial consequence of lost wages is a burden on a juror. The difficulty posed by that burden is an individualized one and on proper examination it may prove to be sufficiently great for a juror and those dependent on him or her that it can affect the juror's ability to complete his or her duties. A juror who is excused because of a true financial hardship suffers from an inability to function that is exclusively personal, as the *Rule* requires, and also is unrelated to the juror's interaction with the other jury members.

At oral argument, both parties conceded that financial hardship can provide a valid basis for dismissing a deliberating juror. Examination of the record developed here reveals that Juror Number Two's request to be excused was based on more than mere inconvenience. Although the trial court led the discussion with the juror and used the artful term "hardship" in that colloquy, we do not find that to be significant. See *Earp, supra*, 85 Cal.Rptr.2d 857, 978 P.2d at 57.

Prior to the trial court's question concerning hardship, Juror Number Two made the following statements: "Well, I need to make some money this week. I thought this was only going to go maybe one, two days, I need to get back on track," and "I'm not getting paid for being here. I gave it my best shot. I stayed here for three days so far." Those statements by Juror Number

Two communicated his concern that he could not continue his jury service because of financial concerns. The record revealed that Juror Number Two was unable to make any money for the three days he was serving as a juror and he stressed his need to earn some wages for that week. He needed to get back "on track," signifying that this juror needed daily earnings to cover regular expenses. Although we would have preferred to have a more explicit exchange between the court and the juror to appreciate fully the extent of financial hardship perceived by the trial court, we decline to hold that the trial court's finding of hardship amounted to an abuse of discretion. We note only that in the future a trial court should determine that the financial hardship is sufficiently significant to justify excusing the juror during deliberations, and would be likely to prevent the juror from concentrating on and participating fully in the deliberations of the jury. Thusly determined, such a hardship constitutes an inability to continue that is, in effect, no less problematic then that of the emotionally distressed juror who can no longer participate in rendering a fair verdict.

## B.

 The Appellate Division majority found that the trial court's substitution of Juror Number Two came at a "critical time" in the jury's deliberation process, and that the juror's statement that he "gave it [his] best shot" implicated the deliberative process itself. We are not persuaded that the record compels that conclusion.

 As the dissent pointed out, Juror Number Two's request to be excused came immediately after the jury asked for a readback of Investigator Kee's and Moore's descriptions of the three suspects, and a readback of all of Williams' testimony. Identification was plainly a key, if not the key, issue in the case. The jury's request for a readback regarding the identification of defendants suggests that the jury had not resolved that critical issue. Although Juror Number Two's statement that he gave it

his best shot, standing alone, could be understood to refer to the deliberative process, the statement should not be read in isolation. Examined in the context of his entire exchange with the trial judge, it appears that the juror simply was expressing his need to resume earning money. Immediately before stating that he gave it his best shot, Juror Number Two explained that he was not being paid during his jury services. He was stressing that he had remained on the jury for three days. To one who requires daily wages, not working for three days out of a week can significantly affect that wage-earner's ability to be "on track" for normal weekly expenses. His comments in their totality convinced the trial court, who observed him, that this was a juror whose concern for the financial hardship already visited upon him prevented him from providing further jury service. Any additional financial loss apparently was more than this juror believed he could bear. The record does not reveal that the juror's request to be dismissed stemmed from any aspect of his interactions with his fellow jurors. To the contrary, the record suggests that his request was linked solely to his financial situation.

Further, although prior to Juror Number Two's dismissal, the jury deliberated for approximately three hours, it appears that the jury had not progressed so far in its deliberations that the substitution of an alternate could not fairly be accomplished. No bright line rule in respect of the length of jury deliberations triggers a finding that deliberations have progressed too far to permit the substitution of an alternate. Here, the precise number of hours and minutes of the prior deliberations are less important because Juror Number Two was excused immediately after the court granted the jury's request for a readback of critical identification testimony. The jury could not have reached a determination of guilt or innocence. On the contrary, the readback requests demonstrate uncertainty concerning guilt or innocence. And, on recommencing deliberations the next day, the jury deliberated for a length of time equivalent to that spent in deliberations before the readback.

In sum, we do not view the jury deliberations to have progressed to such a point that the new juror would not have a realistic opportunity to share in the deliberative process. *Corsaro, supra,* 107 *N.J.* at 354, 526 *A.*2d 1046. Moreover, consistent with *Miller, supra,* after dismissing Juror Number Two and selecting an alternate, the trial court specifically instructed the jury to begin deliberations anew. 76 *N.J.* at 407, 388 *A.*2d 218. We decline to overturn that exercise of discretion by the trial court, especially as a matter of plain error.

## C.

Jury service is a civic duty that each individual owes to the community. *Silagy, supra,* 101 *N.J.Super.* at 461, 244 *A.*2d 542. Financial hardship associated with jury duty is an issue best resolved before the jury is sworn, and ordinarily it is. But a jury of one's peers requires inclusion of all members of the community, excluding no socio-economic group from potential service. Daily wage earners, or others who cannot serve on a jury for long because of salary or wage deprivation, may not be excluded categorically. Our holding acknowledges the financial realities associated with jury service, where an unexpected additional day or two without wages can make a significant difference to a juror, giving rise to a true hardship. But only an individually-demonstrated financial hardship should relieve an already deliberating juror. We do not attempt here to delineate how much financial hardship is necessary under *Rule* 1:8–2(d). The trial court is in the best position to assess the financial reality of continued jury service on a particular juror and to perceive the stress and concern that that may have on the juror's ability to deliberate fairly and fully. Review of an appellate record never fully substitutes for a trial court's interaction with the juror, which includes witnessing the tone and demeanor of the person. To assist with appellate review, the trial court should provide as complete and detailed a record as possible when examining and ruling on a deliberating juror's claimed hardship.

Also, here the trial court informed the parties outside the presence of the jury that a juror had asserted that he could not return for deliberations the next day and, assuming the excuse valid, the parties agreed on a substitution procedure. The trial court reconvened the jury and questioned Juror Number Two in its presence. That procedure did not allow the defense attorneys to object to or discuss the dismissal outside the presence of the jury once Juror Number Two presented his reason for not being able to return. A better approach would be for the trial court to examine the juror outside the presence of the entire jury so that counsel may be uninhibited by any concern for the potential impact on the remaining jurors when discussing the dismissal and substitution.

In summary, we decline to find the decision to dismiss Juror Number Two to be plain error. Although we believe that the colloquy between a court and a juror asserting hardship should strive to obtain a full picture of the individualized hardship to a juror if he or she were required to continue with deliberations until completion, we are unwilling to reject the trial court's determination when all counsel agreed to the substitution at the time and we discern no unfair prejudice to defendant in terms of the jury's deliberative process.

## IV.

The judgments of the Appellate Division are reversed and these matters are remanded to the Appellate Division for further proceedings. Notwithstanding the failure of defendants Williams and McCloud to file protective cross-petitions pursuant to *Rule* 2:12–11, on remand the Appellate Division is directed to address defendants' other claims of error that were not resolved in the court's previous judgments.

*For reversing and remanding*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO, LaVECCHIA, and ZAZZALI—7.

*Opposed*—None.