**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4452-14T1

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

TRAVIS T. HARTSFIELD, JR.,

     Defendant-Appellant.

_____

Argued April 19, 2018 – Decided April 15, 2019

Before Judges Simonelli, Haas and Gooden Brown.

On appeal from Superior Court of New Jersey, Law Division, Essex County, Indictment No. 11-10-1865.

Joshua D. Sanders, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Joshua D. Sanders, of counsel and on the brief).

Frank J. Ducoat, Special Deputy Attorney General/ Acting Assistant Prosecutor, argued the cause for respondent (Robert D. Laurino, Acting Essex County Prosecutor, attorney; Frank J. Ducoat, of counsel and on the brief).

The opinion of the court was delivered by

GOODEN BROWN, J.A.D.

Following a second jury trial,[1] defendant was convicted of murder, N.J.S.A. 2C:11-3(a)(1); and second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a). He was sentenced to an aggregate term of life imprisonment, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. The convictions stemmed from defendant killing his twenty-month-old daughter, A.H., by repeatedly punching her in the chest, causing a fatal liver injury. During police questioning, defendant admitted punching his daughter twice. His defense at trial was that he lacked the requisite state of mind for murder because he never intended to cause serious bodily injury.

Defendant now appeals from his convictions and sentence, raising the following arguments for our consideration:

> POINT I
>
> THE TRIAL COURT ERRED BY PRECLUDING DEFENSE COUNSEL FROM ENGAGING IN A MEANINGFUL CROSS-EXAMINATION OF THE STATE'S CENTRAL EXPERT WITNESS AS TO AN UNCONTESTED PRIOR PROFESSIONAL ERROR COMMITTED BY THAT EXPERT.

---

[1] The first trial ended in a mistrial due to a hung jury.

A-4452-14T1

POINT II

IT WAS ERROR FOR THE TRIAL COURT TO DENY THE APPLICATION FOR A MISTRIAL AND TO SUBSTITUTE A JUROR AFTER BOTH SUBSTANTIAL DELIBERATIONS AND WHEN IT WAS APPARENT THAT THE JURY WAS [DE FACTO] DEADLOCKED.

POINT III

THE JURY CHARGE RELATIVE TO [DEFENDANT'S] STATEMENT WAS INSUFFICIENT TO ADVISE THE JURY OF THE NEED TO CRITICALLY AND EFFECTIVELY EVALUATE THIS STATEMENT IN LIGHT OF THE REALITY THAT JURORS . . . HAVE GREAT DIFFICULTY DISTINGUISHING BETWEEN FALSE CONFESSIONS AND TRUE CONFESSIONS. U.S. CONST. AMEND. VI; N.J. CONST. ART. I, PAR. 10.  (NOT RAISED BELOW)

POINT IV

THE TRIAL WAS SO INFECTED WITH ERROR THAT EVEN IF EACH INDIVIDUAL ERROR DOES NOT REQUIRE REVERSAL, THE AGGREGATE OF THE ERRORS DENIED [DEFENDANT] A FAIR TRIAL.  (NOT RAISED BELOW)

POINT V

[DEFENDANT'S] SENTENCE IS EXCESSIVE AND MUST BE REDUCED.

After considering the arguments presented in light of the record and applicable

law, we affirm.

We glean the following facts from the trial record. A.H. was born out of a dating relationship between defendant and D.J. D.J. and defendant did not live together. However, because D.J. worked two jobs, and defendant was unemployed, while D.J. was at work, defendant cared for A.H. at his mother's home where he lived with his mother and his younger sister. A.H. had a history of health and developmental problems. She was underweight, did not walk, had limited talking ability, had acid reflux, and was diagnosed with a heart murmur at two weeks old after she vomited and temporarily stopped breathing.

On the morning of March 14, 2011, D.J. brought A.H. to the shopping center, where she worked, to hand A.H. off to defendant before her shift began. She provided defendant with a baby bag, money, and pre-cooked food for A.H., who at the time was happy and energetic, and had no bruises, scrapes, or scratches. At 7:00 p.m., when D.J.'s shift ended, she called defendant, had a half-hour to hour-long conversation with him, and heard A.H. in the background.

When D.J. called defendant again at about 10:00 p.m., defendant informed her that A.H. had vomited and he was cleaning it up, but his tone sounded as if he was aggravated and D.J. did not hear A.H. in the background during the call. Defendant's mother arrived home between 10:20 and 10:30 that night, and observed A.H. laying on defendant's bed while defendant was sitting at the end

of the bed playing a videogame.  When she greeted A.H., A.H. lifted her head and appeared "congested," prompting defendant's mother to inquire whether A.H. had a cold.  Defendant replied that she did.  After helping defendant's sister with her homework, defendant's mother went to sleep.

Later, at 12:39 a.m. on March 15, 2011, D.J. was awakened by a telephone call from defendant, and noticed she had seven to eight missed calls from defendant on her phone.  Defendant informed D.J. that A.H. was not breathing, and when he woke up to change her diaper, she was "ice cold."  D.J. told defendant to call 9-1-1 and promptly headed for his house.  When 9-1-1 call-taker Lauri Biverfeld received the call from defendant at 12:41 a.m., she noted that he was not hysterical or upset during the call as people normally were in that situation and did not mention that his child was not breathing until one minute and twenty-eight seconds into the call.  Biverfeld dispatched emergency medical assistance to the Hartsfield residence, instructed defendant to perform cardiac pulmonary resuscitation (CPR) on A.H., and guided him through the process.

Emergency Medical Services (EMS) technicians Paul Visoskas and John Berghoefer were the first to respond to the Hartsfield residence.  Visoskas observed A.H. lying on her back on the kitchen floor, with defendant standing over her "very calmly."  A.H. "had turned ashen" and was not breathing.  Her

pupils were fixed and dilated. Defendant told Visoskas that A.H. had been in that condition "for at least [forty] minutes." Berghoefer checked for breathing and a pulse, but did not detect either. He picked up A.H., performed CPR, carried her outside, and delivered her to paramedics Juan Carlos Jurjo and Dan Rice, who arrived at the residence at 12:48 a.m. Jurjo and Rice placed A.H. on a stretcher, performed CPR, and attached electronic monitoring devices to her. Jurjo also observed that A.H. was "cold to the touch" and "asystole," meaning she had no heartbeat. In addition, there was bruising on her chest that "resembled multiple small round spots[,]" as well as trauma in the mouth area. Jurjo inserted an interosseous line into A.H.'s shin bone to administer medications and fluids, and Rice intubated her. However, despite continuing CPR during the ride to the hospital, A.H. did not respond. The paramedics arrived at the hospital at 12:58 a.m. and handed A.H. over to the emergency room staff. At the time, A.H. was still aystolic, not breathing, had no pulse, and had a temperature of eighty-five degrees.

Dr. Maria Alvarez-Ballway, the attending physician in the Pediatric Emergency Department at University Hospital, began treating A.H. at 1:00 a.m. Although she did not do a full-body assessment of A.H.'s bruising, she observed eleven chest bruises on A.H., as well as bruises or scratches on her back, arms, forehead, ear, and face. Her staff continued CPR and attempted to warm the

body with the hope that medication would become effective at higher temperatures. However, after an hour of treatment, A.H. lacked any vital signs and was pronounced dead at 2:00 a.m.

D.J. arrived at the Hartsfield residence after the first responders had left, and observed defendant speaking in a "laid back" fashion with police officers. Upon learning that A.H. had been taken to the hospital, which was a little over a half-mile from defendant's house, D.J. ran to the hospital. Newark Police Department Detective Levi Holmes was one of the officers speaking to defendant at his house. Holmes arranged for defendant to be transported to the police station and recorded a formal statement from him at 3:45 a.m. At the time, defendant was not a suspect and was not informed that his daughter was dead. Holmes noted that during the statement, defendant was "very cooperative" and "calm," but never inquired about his daughter's condition. Defendant admitted that A.H. was with him since he picked her up from D.J., and said that he noticed A.H. was not breathing at about 12:20 a.m. to 12:30 a.m. when he went to change her diaper. He also stated that A.H. had no marks or bruises on her other than a chest bruise from sleeping on a necklace.

Two Division of Child Protection and Permanency (DCPP) caseworkers responded to the police station on the morning of March 15 and interviewed defendant following his interview with Holmes. They described defendant's

demeanor as "very flat." During the interview, defendant again attributed A.H.'s chest bruises to a necklace, and became frustrated when the caseworkers questioned him regarding A.H.'s temperature. Defendant also spoke with D.J. on the telephone at some point later that day and swore "on his great[-]grandmother[]" that he did not do anything to cause harm to A.H.

Eddy Lilavois, Assistant Medical Examiner for the Northern Regional Medical Examiner's Office, began A.H.'s autopsy at 10:10 a.m. on March 15. He observed "multiple injuries" on "the head," "the torso," and "the extremities" of her body. Notably, he observed "a series of bruises that covered the lower part of the chest extending over the upper abdomen." He found that the "pattern of injuries was clearly demarcated and . . . was the imprint of knuckle injuries imparted on the chest of the decedent." He also observed bruises and injuries on A.H.'s internal organs, including the thymus, right lung, and liver, and when he cut into the abdominal wall, "blood came gushing out of the abdomen."

Lilavois concluded that the cause of death was "multiple blunt impact injuries of the torso," which resulted in a fatal liver tear that caused A.H. to internally bleed to death. He determined that the manner of death was homicide. He opined that "[a] very strong blow, or . . . series of strong blows," was necessary to cause the injuries he observed to the chest and underlying organs, and explained that the blows "were strong enough to crush the spongy lung and

break the vessels inside." According to Lilavois, the injuries to the chest presented a "very specific pattern[,]" which he attributed "to direct blows to the chest by a closed fist with the knuckles presenting up front."

Upon receipt of the medical examiner's report, defendant became the main target of a homicide investigation based on his earlier acknowledgement that A.H. had been with him since he picked her up from D.J. the prior morning. Detective Paul Sarabando of the Essex County Prosecutor's Office took a formal recorded statement from defendant, which began at 6:40 p.m. on March 15. Initially, Sarabando and his partner read Miranda[2] warnings to defendant, and defendant waived his rights and agreed to give a statement.

During the questioning, the detectives asked defendant a series of questions about the events leading up to the death of his daughter. Defendant confirmed that he was home alone with A.H. between 1:30 p.m. and 10:30 p.m. According to defendant, A.H. had napped from 1:30 p.m. to 4:30 p.m. and had a chocolate drink and juice before going back to sleep. After she awoke at about 7:00 p.m., he attempted to feed her, but she did not want to eat. So, instead, he gave her another drink and she slept until his mother returned home at about 10:30 p.m. After his mother arrived home, he laid A.H. down to sleep again and

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

 A-4452-14T1

claimed that he did not notice that she was not breathing until around 12:30 a.m. when he went to change her diaper.

After listening to defendant, Sarabando stated, "[t]here's something missing in between all that. You want to tell us what's missing?" Defendant responded, "[a]bout the part when she didn't want to eat[?]" Defendant then explained that A.H. refusing food "[k]ind of made [him] a little upset[,]" and "[he] kind of lost it." He further explained:

> So I was basically trying to force her to eat. Like, she would put -- she would eat pudding in her mouth, but she wouldn't chew it, like, chew your food. So I kind of got upset and -- and punched her twice in the chest. That was it. And nothing else.

Defendant demonstrated the position of his punches, "[l]ike where her breasts [were]," and explained that he used both hands and closed fists. According to defendant, "as soon as" he punched her, she vomited, cried, and started to breathe differently. He described her breathing as "a bad cough, . . . [that] wouldn't come out." After delivering the punches, he told A.H. to "go lay down," and she crawled away. He estimated that the incident occurred about thirty minutes before his mother arrived home, at around 10:00 p.m. When asked why he did not call an ambulance, defendant stated, "I didn't think [any]thing of it then because I thought it was just okay, like, I punched her twice, she -- she's all right. She's just breathing." Unsolicited, defendant later stated,

10

"I believe I have anger issues . . . . [m]ajor." Defendant was then placed under arrest.

At the trial, the State presented thirteen fact witnesses. D.J. and defendant's mother testified about the family background and their involvement in the events of the day in question. DCPP caseworkers testified about their investigation of the case. Visoskas, Berghoefer, and Jurjo testified about the emergency medical response and delivery of A.H. to the hospital, and Alvarez-Ballway testified about the emergency room treatment provided to A.H. at the hospital. Biverfeld testified about the 9-1-1 call, which was played for the jury, and Sarabando and Holmes detailed the investigation and defendant's statements. Defendant's videotaped confession was played for the jury during Sarabando's testimony. Additionally, Crime Scene Unit members testified about evidence collection at the Hartsfield residence.

Lilavois was the State's sole expert witness at trial. He testified about the autopsy results and described the fatal liver injury in detail, noting it would not have been survivable even if it had occurred on the steps of the hospital. He opined that, based on the discoloration of the bruises, the injuries he observed—including the bruised lips and the chest and back bruises—all occurred contemporaneously and prior to A.H.'s death. According to Lilavois, the coloration of the bruises indicated that they were "sustained within a few hours,"

but certainly "[l]ess than a day" before her death. He also opined that A.H. was "practically dead" by the time the emergency medical service personnel arrived at the Hartsfield residence, and that her cold temperature indicated that she had been in a "lifeless condition, or close to lifeless condition, for some[ time]." He testified that none of the injuries he observed were caused by CPR or intubation because when the first responders arrived, based on A.H.'s reported condition, there would not have been enough blood in "circulation" for any "bruising" to have occurred.

Defendant did not testify but produced one expert witness, Dr. Zhonghue Hua, a physician, forensic pathologist, and neuropathologist. After reviewing the autopsy report prepared by Lilavois, Hua agreed with Lilavois that the sole cause of death was defendant punching A.H., resulting in the fatal liver injury. However, Hua expressed several minor disagreements with Lilavois' findings and conclusions, and two major disagreements related to the effect of the CPR or intubation and the time of death. Contrary to Lilavois, Hua opined that CPR or intubation could have caused some of the injuries observed on A.H.'s body, and that A.H.'s time of death was mere minutes before her pronouncement at the hospital at 2:00 a.m. Hua premised the latter conclusion on the presumption that the emergency medical personnel would not have attempted to resuscitate A.H. for so long if she had been truly dead.

12

Following the jury verdict, on December 22, 2014, the trial court sentenced defendant to life imprisonment subject to NERA on the murder charge,[3] and a concurrent ten-year term with a five-year period of parole ineligibility on the child endangerment charge. A memorializing judgment of conviction was entered and this appeal followed.

## II.

In Point I, defendant argues that the court erred by preventing him from cross-examining Lilavois about his involvement "in a shaken-baby case" that occurred in 1993, and his subsequent resignation from a job in 1995, in order to challenge his "professional competency" and "credibility." According to defendant, "[t]he refusal to allow meaningful cross-examination of [Lilavois] when his opinion was the issue before the jury was egregiously unfair" and deprived him of his "right to a fair trial." We disagree.

In a civil suit stemming from the 1993 incident, a New York court summarized Lilavois' involvement as follows:

> Three-year-old Andrew Lauer died on August 7, 1993. That same day, Dr. Eddy Lilavois, a New York City Medical Examiner, performed an autopsy and

---

[3] A defendant convicted of a crime subject to NERA must serve eighty-five percent of his sentence before he is eligible for parole. N.J.S.A. 2C:43-7.2(a). "Solely for the purpose of calculating the minimum term of parole ineligibility . . . , a sentence of life imprisonment shall be deemed to be [seventy-five] years." N.J.S.A. 2C:43-7.2(b).

prepared a report stating that the child's death was a homicide caused by "blunt injuries" to the neck and brain. Although the report indicated that the brain was being preserved for further examination, the following day a death certificate was issued stating that Andrew's death was a homicide. Based on the Medical Examiner's conclusion, the police began investigating what they thought was a homicide, focusing primarily on plaintiff, Andrew's father. Weeks later, on August 31, 1993, the Medical Examiner and a neuropathologist conducted a more detailed study of Andrew's brain. The report, prepared in October 1993, indicated that a ruptured brain aneurysm caused the child's death, thus contradicting the earlier conclusion. The Medical Examiner, however, failed to correct the autopsy report or death certificate, and failed to notify law enforcement authorities.

Meanwhile, the Police Department's investigation into Andrew's death continued. Some [seventeen] months later, in March 1995, after a newspaper exposé, the autopsy findings were revised, the police investigation ceased and an amended death certificate was prepared. As a result of this incident, the City Medical Examiner who had conducted the examination resigned.

[Lauer v. City of N.Y., 733 N.E.2d 184, 186 (N.Y. 2000).]

During the first trial, the judge granted the State's in limine motion, precluding cross-examination about the incident, stating:

It appears to me that the actual details of the misdiagnosis or initial misdiagnosis because I don't know that we really had a mistake here, but . . . accepting . . . the factual allegations that the [S]tate has made with regard to what happened back [twenty] years

14

ago, in essence, that a diagnosis was made of a particular cause of death which led the doctor to call it a homicide and then when they got back certain lab results, he realized . . . it was a different cause of death, which now led him to believe it was not a homicide. And it had to do with an aneurysm . . . . And that, obviously, has nothing to do with the cause of death in this particular case.

So, factually, medically, there is no relevance between the issues in determining the cause of death from a [twenty]-year-old case to the cause of death in this case. Even if there was, it's [twenty] years ago, and . . . there would have to be, as counsel said, a trial within a trial, to educe all the circumstances regarding that particular diagnosis, how it was made -- the state of the art of the medical profession at that time may have been different than it is today when this diagnosis was made -- and why the doctor made the diagnosis he made, and what the conditions were, and whether it was appropriate for him to do so.

But we all know, and counsel admits for the defense, that's not really the issue. The issue is his failure to disclose that to the investigative authorities when he changed the manner of death from homicide to . . . natural causes . . . .

. . . [A]nd I find that Rule [404(b)] applies and this is . . . a prior bad act. And . . . [404(b)] tells us that, except as otherwise provided under Rule [608(b),] which doesn't apply, evidence of other crimes, wrongs[,] or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith. And there has been no indication by counsel to me that the . . . evidence would be introduced for any other reason such as opportunity, intent, motive, preparation, [etc.]

So, the fact that it's [twenty] years old, the fact that it would cause undue extra time to be taken in trial dealing with the actual facts of this [twenty]-year-old case, the facts of which are irrelevant, . . . leads me to preclude that evidence.

During the second trial before a different judge, defendant expressed his continuing objection to the ruling, to which the trial judge responded that he was "not changing [the prior judge's] ruling on that subject[,]" a ruling with which he "[did] not disagree."[4]

We recognize the well-established principle in our system of criminal jurisprudence that "an accused is entitled to advance in his defense any evidence which may rationally tend to refute his guilt or buttress his innocence of the charge made." State v. Garfole, 76 N.J. 445, 453 (1978), aff'd following remand, 80 N.J. 350 (1979). Equally established is the principle that "[t]he admission or exclusion of evidence at trial rests in the sound discretion of the trial court." State v. Willis, 225 N.J. 85, 96 (2016) (citing State v. Gillispie, 208 N.J. 59, 84

---

[4] We reject as specious defendant's procedural challenge to the judge relying on the prior judge's ruling. While "[t]he declaration of [a] mistrial rendered nugatory all of the proceedings during the first trial[,]" and each party "was entitled to offer evidence and to make motions and objections without limitation to that which had been offered or made at the first trial, . . . without being bound by the prior rulings of the court with respect thereto[,]" State v. Hale, 127 N.J. Super. 407, 413 (App. Div. 1974), a judge is not precluded from adopting a prior evidentiary ruling by a different judge or required to conduct a hearing in the absence of a motion for reconsideration.

(2011)).  We will sustain the trial court's evidentiary ruling "unless it can be shown that the trial court palpably abused its discretion, that is, that its finding was so wide [of] the mark that a manifest denial of justice resulted[,]" State v. Lykes, 192 N.J. 519, 534 (2007) (first alteration in original) (quoting Verdicchio v. Ricca, 179 N.J. 1, 34 (2004)), or "on a showing that there has been a 'clear error in judgment.'"  State v. Harris, 156 N.J. 122, 178 (1998) (quoting State v. Koedatich, 112 N.J. 225, 313 (1988)).

Likewise, "the scope of cross-examination is a matter for the control of the trial court and an appellate court will not interfere with such control unless clear error and prejudice are shown."  State v. Murray, 240 N.J. Super. 378, 394 (App. Div. 1990).  Generally, cross-examination "should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness."  N.J.R.E. 611(b).  However, experts may also be questioned regarding "testimonial and experiential weakness[es.]"  Janus v. Hackensack Hosp., 131 N.J. Super. 535, 541 (App. Div. 1974) (quoting Angel v. Rand Express Lines, Inc., 66 N.J. Super. 77, 86 (App. Div. 1961)).  Additionally, "an expert witness is always subject to searching cross-examination as to the basis of his opinion[,]" State v. Martini, 131 N.J. 176, 264 (1993) (quoting Glenpointe Assocs. v. Twp. of Teaneck, 241 N.J. Super. 37, 54 (App. Div. 1990)), rev'd in part on other grounds, State v. Fortin, 178 N.J. 540, 646 (2004), and any change

of opinion, <u>Murray</u>, 240 N.J. Super. at 395, as well as issues that demonstrate bias or partiality. <u>State v. Wakefield</u>, 190 N.J. 397, 451-52 (2007).

Here, defendant sought to cross-examine the State's expert with evidence of other wrongs or acts. "[E]vidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith." N.J.R.E. 404(b). However, "[s]uch evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity[,] or absence of mistake or accident when such matters are relevant to a material issue in dispute." <u>Ibid.</u> Here, defendant sought to introduce the evidence to impeach the expert's credibility and undermine his professional competency.

In order to be admissible under Rule 404(b),

> 1. The evidence of the other [crimes, wrongs, or acts] must be admissible as relevant to a material issue;
>
> 2. It must be similar in kind and reasonably close in time to the offense charged;
>
> 3. The evidence of the other [crimes, wrongs, or acts] must be clear and convincing; and
>
> 4. The probative value of the evidence must not be outweighed by its apparent prejudice.
>
> [<u>State v. Cofield</u>, 127 N.J. 328, 338 (1992) (quoting Abraham P. Ordover, <u>Balancing The Presumptions Of Guilt And Innocence: Rules 404(b), 608(b), And</u>

609(a), 38 Emory L.J. 135, 160 (1989)) (footnote omitted).]

"Generally, courts apply that rule to evidence of 'other crimes, wrongs, or acts' of the defendant in a criminal case." State v. Gookins, 135 N.J. 42, 46 (1994). However, "[w]hen the defendant is offering the evidence, a less stringent test of relevancy applies and prejudice to the defendant is not a factor." State v. Franklin, 384 N.J. Super. 306, 310 (App. Div. 2006) (citing Garfole, 76 N.J. at 452). Indeed, "simple relevance to guilt or innocence should suffice as the standard of admissibility[.]" Garfole, 76 N.J. at 452-53. However, when the defendant seeks to use Rule 404(b) evidence not as substantive proof of guilt of a third party but to attack the credibility of a witness, "[p]rejudice to the State, as well as confusion of the issues and misleading the jury, must be evaluated in balancing all of the factors." Franklin, 384 N.J. Super. at 312. "'[W]hat is called for . . . is a highly discretionary determination as to the admissibility of the defendant's proffered evidence' which weighs and takes into account the competing considerations listed in [Rule] 403." State v. Fulston, 325 N.J. Super. 184, 190-91 (App. Div. 1999) (first alteration in original) (quoting Garfole, 76 N.J. at 457).

Applying these principles, we discern no abuse of discretion in the judge's ruling. When Lilavois testified at defendant's trial in 2014, he had been in his

position for eighteen years and had performed close to 500 autopsies just in the three years prior to the trial. Defendant sought to introduce evidence of a 1993 misdiagnosis in an unrelated case and resulting resignation in an attempt to discredit Lilavois' current professional competency and impeach his credibility. However, specific instances of past conduct cannot be used on cross-examination to attack a witness' credibility. See, e.g., State v. Hernandez, 225 N.J. 451, 466 (2016) (explaining that inconsistent statements made by a confidential informant in another trial were not admissible under N.J.R.E. 608 to impeach the informant's credibility in current trial); State v. Parker, 216 N.J. 408, 422-25 (2014) (prosecutor's use of evidence that defendant previously used false names to impeach his credibility warranted a new trial); State v. Spivey, 179 N.J. 229, 242 (2004) (upholding exclusion of evidence of police officer's "single alleged act of prior misconduct" by assaulting and framing a different defendant "in an unrelated case tried several years earlier" when proffered by defendant to show bad character of same officer in defendant's trial on drug related and assault charges).

Indeed, the credibility of a witness may only be attacked using past conduct evidence if "the witness made a prior false accusation against any person of a crime similar to the crime with which defendant is charged," Rule 608(b), or if the past conduct evidence falls under an exception set forth in any

other Rule of Evidence, none of which apply here. See, e.g., N.J.R.E. 609 (providing prior criminal conviction may be used to impeach credibility of witness); N.J.R.E. 608(a) ("Except as otherwise provided by Rule 609 . . . , a trait of character cannot be proved by specific instances of conduct"); N.J.R.E. 405(a) (providing "[s]pecific instances of conduct not the subject of a conviction of a crime shall be inadmissible").

As to challenging Lilavois' professional competency, the remote 1993 incident fails to satisfy prong four of the Cofield test inasmuch as its marginal probative value is vastly outweighed by its prejudice to the State. Thus, we agree with the judge that the evidence was inadmissible under Rule 404(b), and we are satisfied that none of the cases cited by defendant mandate a different outcome. Cf. State v. Parsons, 341 N.J. Super. 448, 458-59 (App. Div. 2001) (holding that the pendency of official misconduct charges relating to an arresting officer's involvement with drug dealers was admissible under Rule 404(b) to attack the officer's credibility in the defendant's prosecution for drug and weapons possession charges); Gookins, 135 N.J. at 44-48 (vacating the drunk driving convictions of three defendants so that they could offer evidence under Rule 404(b) of the arresting officer's guilty plea to fabricating breathalyzer readings in another drunk-driving case and being implicated in similar

misconduct in others where the principal evidence against the defendants consisted of the breathalyzer readings performed by the officer).

Moreover, as the judge recognized, the introduction of the evidence would have led to "a trial within a trial," and any probative value it possessed was substantially outweighed by the undue risk of prejudice to the State, consumption of time, confusion of the issues, and misleading the jury. N.J.R.E. 403. Cf. Harris, 156 N.J. at 178 (holding trial court did not abuse discretion in excluding past conduct evidence under Rule 403 because evidence had minimal probative value, incidents occurred years earlier, and evidence "would only divert attention from the true issues" in case).

III.

In Point II, defendant argues that the judge erred by substituting an alternate juror rather than declaring a mistrial after "the jury had passed the point of no return" during their deliberations. According to defendant, the "late substitution was error either due to the [de facto] deadlock or due to the extent of the prior deliberations." We disagree.

After ten days of trial, jury deliberations commenced at 1:42 p.m. on October 22, 2014, and, over the course of two days, October 22 and 23, the jury spent approximately nine-and-one-half hours deliberating. At the jury's request, deliberations were interrupted during that two-day period for a play back of the

22

tape of defendant's confession and the 9-1-1 call, as well as additional instructions on "knowingly" and the state of mind requirements for murder.[5] On the morning of October 24, 2014, after advising a Sheriff's officer that he wanted to speak with the judge, juror seven notified the court that "[y]esterday, in the jury room, juror number [fifteen] had stated she had [a] previous . . . investigation with DYFS and we, as a whole, feel that that's impeding . . . her judgment . . . to make a decision." The juror explained that other members of the jury also heard the comments and when asked by counsel why he believed the juror's prior experience was impeding her judgment, juror seven responded that juror fifteen was "showing too much emotion and not basing her decision on facts and evidence."

The judge then questioned juror fifteen, who admitted to previous involvement with "DYFS" when she was the subject of a child abuse investigation "about [twenty] years ago," and admitted that she pled guilty to theft in 2008, although she had failed to disclose either fact during jury selection. Contrary to juror seven's representations, she also denied having discussed her "DYFS" involvement with any other juror and claimed she had no bias. The prosecutor moved to excuse juror fifteen for failing to disclose the information

---

[5] The alternate was present in the courtroom when the judge responded to the jury's requests.

during jury selection, arguing she would have exercised a peremptory challenge to remove the juror at the outset had the juror been truthful. However, before the judge could issue his ruling, juror eight asked to speak with the judge, and inquired "if the jury comes back deadlocked, [does] the person get retried again," and "if so, how many times?" After consulting with counsel, the judge responded to juror eight that "[i]t [was] the jury's duty to decide this case on the evidence produced in this courtroom and not on the consequences of their decision," and directed juror eight not to discuss their conversation "with [her] fellow jurors."

Thereafter, defense counsel requested a mistrial. Although she agreed with the prosecutor that juror fifteen had to be excused, she argued that the case could not proceed with an alternate juror because the circumstances of juror fifteen's removal went beyond "a personal issue[.]" Instead, the circumstances "indicate[d] that juror bias was injected into the jury room[,]" and "that this jury has gone too far for a substitute juror to be put in at this time." The prosecutor opposed a mistrial, arguing that the reason for removal was "juror misconduct" based on juror fifteen intentionally withholding information and making deliberate misrepresentations to the court. She urged the judge to conduct a voir dire of the remaining jurors to determine if juror fifteen's comments affected

their ability to be fair and impartial, and, if not, to allow deliberations to continue with an alternate juror.

Later that day, the judge removed juror fifteen because she "concealed" her prior conviction and "DYFS" investigation during jury selection. The judge determined that her "willful dishonesty" and "emotional instability" made her "[un]fit to serve" and incapable of "discharging the obligations of a juror." Moreover, the parties agreed that juror fifteen "had to be discharged." However, the judge found that "[her] inability to continue as a juror [was] personal to her" because her "misconduct" did not relate "to her interaction with her fellow jurors or with the case[] itself." The judge excused the remaining jurors for the day, without any deliberations occurring that day, informed them of juror fifteen's removal, and instructed them "not to speculate [as to] the reason" for her removal or have her removal "enter into [their] discussions or deliberations in any manner, for any purpose, at any point."

When the remaining jurors returned four days later, on October 28, 2014, without "intrud[ing] into the specifics of jury deliberations[,]" the judge conducted separate interviews with each deliberating juror in order "to determine 'whether a reconstituted jury will be in a position to meaningfully . . . evaluate and discuss the case.'" See State v. Ross, 218 N.J. 130, 149 (2014). After cautioning each juror not to say anything about their or any other juror's

25 A-4452-14T1

position on the case, how they or any other juror intended to vote, the vote tally, or any discussions in the jury room, the judge inquired of each juror whether he or she heard juror fifteen make reference during deliberations to her personal experience with "DYFS." If so, the judge inquired whether the juror could set aside those comments and decide the case based on the evidence produced and nothing else. All but one juror heard juror fifteen's comments, which included references to her being treated unfairly. However, all the jurors who heard the comments told the judge they were able to set the comments aside and decide the case solely on the evidence produced in the courtroom.

Based on the jurors' responses to the individual questioning, the judge concluded "no deliberating juror ha[d] been tainted" and deliberations had not progressed to the point where deliberations could not commence anew. Thus, the judge denied defendant's motion for a mistrial, explaining:

> Here, there's no indication that the original jury has proceeded too far in their deliberations to begin anew with the remaining alternate juror substituted in for juror [fifteen]. The jury thus far has deliberated only for approximately [nine-and-one-half] hours . . . . And during that time, they have sent out four notes asking to see and hear . . . evidence and asking for clarification on legal principles.
>
> The jury sent out its final note of this nature approximately two hours before it finished deliberating for the day on Thursday, October 23[], which was its last day of deliberating. The number and substance of

jury notes in the comparatively short time the jury has spent deliberating, in relation to the great length of the trial[] itself, indicates that the jury has not yet reached a decision on the issues of fact and law present in this case. . . .

Additionally, juror [eight's] hypothetical question about the consequences of a deadlock is of no moment. Juror [eight] asked this question on Friday, October 24[], while the jury was not deliberating because the [c]ourt was working to address juror [fifteen's] misconduct. This question was raised by a single juror, not the jury as a whole, and it was raised in a hypothetical manner that did not suggest to the [c]ourt that the jury had determined that it could not come to a decision on any issues of fact or law.

Accordingly, the jury's deliberations have not progressed to the point that a reconstituted jury would be unable to evaluate and discuss the case in a meaningful way and a mistrial is not warranted . . . .

The court seated the only alternate, juror number two, and instructed the newly constituted jury as follows:

As you know, juror number [fifteen] has been . . . excused from the jury. An alternate juror, number [two], will take her place. . . .

Because of this change in your jury, you must set aside and disregard all of your past deliberations and begin your deliberations again, just as if you were now entering the jury room for the first time directly after listening to my charge.

In that connection, the notes that you wrote, or whatever you put into that envelope[,] . . . . is [going

27

to] be destroyed. You'll have new paper to make new notes.

Now, in beginning your deliberations again, you must eliminate any impact that juror [fifteen] may have had on your deliberations and consider the evidence in the context of full and complete deliberations with a new member of your jury, juror number [two].

The reconstituted jury deliberated for approximately one hour and forty-three minutes in total, before rendering a verdict of guilty.

"Our review of a trial court's decision to remove and substitute a deliberating juror because of an 'inability to continue,' pursuant to Rule 1:8-2(d)(1)," and its denial of a motion for a mistrial based upon the removal and substitution, is deferential, warranting reversal only if "the court has abused its discretion." State v. Musa, 222 N.J. 554, 564-65 (2015). "[T]he 'inability to continue' standard is necessarily vague because it is impossible to catalogue the myriad circumstances personal to a deliberating juror that may warrant her removal and substitution." State v. Jenkins, 182 N.J. 112, 124 (2004). Thus, deference to the "trial court fact-findings in this setting must guide our analysis." Musa, 222 N.J. at 565.

The juror substitution procedure delineated in Rule 1:8-2(d)(1) does not "offend our constitutional guaranty of trial by jury[,]" State v. Miller, 76 N.J. 392, 406 (1978), rev'd on other grounds, Miller v. Fenton, 474 U.S. 104 (1985),

and substituting a juror in the course of deliberations "does not in and of itself offend a defendant's constitutional guarantee of a trial by jury." State v. Williams, 171 N.J. 151, 162 (2002). "Such a substitution, however, contravenes constitutional norms if it impairs the mutuality of deliberations—the 'joint or collective exchange of views among individual jurors.'" Ross, 218 N.J. at 146-47 (quoting Williams, 171 N.J. at 163).

Because "[t]he trial court is charged with maintaining 'an environment that fosters and preserves that exchange until the jury reaches a final determination[,]'" id. at 147 (quoting Williams, 171 N.J. at 163), "the trial court must appraise the impact of a juror substitution on the jury process, without tainting that process with intrusive questions. It must conduct any inquiry with respect to the juror in question, or the jury as a whole, with caution and restraint." Ibid. In that regard, the trial court must assess two related issues:

> First, the trial court must determine the cause of the juror's concern and assess the impact of the juror's departure on the deliberative process. Second, in light of the timing of the juror's dismissal and other relevant considerations, the trial court must ascertain whether a reconstituted jury will be in a position to conduct open-minded and fair deliberations.
>
> [Ibid.]

"Consistent with the language of Rule 1:8-2(d)(1), and in the absence of indicia that a reconstituted jury cannot engage in meaningful deliberations, our

courts have consistently upheld the substitution of an alternate for a juror excused for personal reasons unrelated to the case." Ibid. Personal reasons prompting a juror's departure in the midst of deliberations "do not originate in the interactions between the excused juror and the remaining jurors. Accordingly, they do not preclude the substitution of an alternate for the excused juror." Id. at 148.

After determining "whether issues personal to the juror or troubled relationships in the jury room" prompted the juror's departure,

> the trial court should consider whether a reconstituted jury will be in a position to meaningfully evaluate and discuss the case. "No bright line rule in respect of the length of jury deliberations triggers a finding that deliberations have progressed too far to permit the substitution of an alternate." [Williams, 171 N.J. at 169.] Instead, the court should consider such factors as the timing of the juror's departure, his or her explanation of the problem prompting the inquiry, and any communications from the jury that may indicate whether deliberations have progressed to the point at which a reconstituted and properly charged jury will be unable to conduct open and mutual deliberations.
>
> [Id. at 149.]

In Ross, our Supreme Court offered guidance to trial courts in determining whether a reconstituted jury will meaningfully deliberate. It explained:

> First, the trial judge should conduct any inquiry of the juror seeking to be excused with caution, and should direct the juror not to reveal confidential jury

communications. Second, the trial court may consider the duration of the jury's deliberations prior to the departure of the juror. Without applying an inflexible rule that would preclude substitution after a specific amount of time has elapsed, the trial court should determine whether the jury appears to have progressed to a stage at which issues have been decided and deliberations cannot commence anew. Third, if a partial verdict has been rendered, or the circumstances otherwise suggest that jurors have decided one or more issues in the case, the trial court should not authorize a juror substitution, but should declare a mistrial.

Finally, if the trial court permits the substitution of an alternate juror for an excused juror, it must instruct the newly composed jury before its deliberations. The trial court should charge the jury that the excused juror's departure was prompted by personal issues, rather than by his or her view of the case or relationships with other jurors, that the reconstituted jury should not speculate on the reasons for the juror's departure, and that the jury should begin deliberations anew by setting aside their previous discussions so that the reconstituted jury may conduct full and complete deliberations.

[Id. at 151 (citations omitted).]

Applying these principles to this case, we are satisfied that the judge's decision to remove juror fifteen for misconduct and substitute the alternate did not constitute an abuse of discretion. Defendant does not dispute that juror fifteen was properly removed for personal reasons based on her misrepresentations during jury selection about her prior criminal conviction and "DYFS" involvement and her resulting emotional state as reported by juror

31                                                                    A-4452-14T1

seven.  See Jenkins, 182 N.J. at 130 (holding the trial court could have properly excused the juror due to her bias where the juror refused "to abide by her sworn oath to follow the law due to her emotional identification with defendant"); Miller, 76 N.J. at 406-07 (holding the trial court properly substituted an alternate for juror who "stated that in his then nervous and emotional condition, he did not think he could render a fair verdict"); State v. Trent, 157 N.J. Super. 231, 235-36, 240 (App. Div. 1978) (authorizing replacement of juror who cited her "nervous" and "emotional" condition because defendant reminded her of her son), rev'd on other grounds, 79 N.J. 251 (1979).

After thoroughly examining every remaining juror individually, the judge determined that the jury had not been tainted or prejudiced by juror fifteen's comments and could remain fair and impartial.  The judge also concluded that no communications with the original jury suggested that any juror had reached a determination on a factual or legal issue, or that the jury was unable to engage in open-minded discussions after the substitution that would deprive the new juror of a realistic opportunity to share in the deliberative process.  In that regard, the judge dismissed juror eight's question about the consequence of a deadlock because the question was posed by a single juror as a hypothetical on a day when the jury was not deliberating.  The judge replaced juror fifteen with the alternate and provided instructions to the newly constituted jury in

accordance with the Model Criminal Jury Charge. We presume that the judge's instructions were followed. See State v. Winder, 200 N.J. 231, 256 (2009). Thereafter, the newly constituted jury rendered a verdict after deliberating for a period sufficient to permit an open and thorough discussion of the issues.

Here, there was no "partial verdict" as in State v. Corsaro, 107 N.J. 339, 340-42, 354 (1987), where the Court determined it was plain error "to substitute a juror after a partial verdict ha[d] been returned and to allow the reconstituted jury to reach a final verdict on [the] remaining charges." Additionally, here, there was no indication during the judge's questioning that any of the jurors had already made up their minds as in Jenkins where the Court determined "a mistrial should have been declared" because "minds were closed when the alternate joined the deliberations." 182 N.J. at 133. Indeed, in appropriate circumstances, even the specter of a deadlocked jury would not preclude substitution. See Ross, 218 N.J. at 154-55 (overruling State v. Banks, 395 N.J. Super. 205, 218-20 (App. Div. 2007), "to the extent that it generally barred trial courts from substituting a juror and directing new deliberations, by virtue of the fact that the original jury had reached an initial impasse and was charged in accordance with [State v. Czachor, 82 N.J. 392 (1980)]").

Defendant argues that his case "is akin" to State v. Williams, 377 N.J. Super. 130 (App. Div. 2005). In Williams, we held that a mistrial should have

been declared where "the jury had been deliberating for approximately twelve hours" before the substitution and deliberated for "fifty-nine minutes" after the substitution before convicting defendant of two counts of sexual assault. Id. at 150. We noted that "the length of the deliberations was substantially longer prior to the removal and substitution . . . than afterwards[,]" and that it was "highly doubtful that the jury could have been expected to begin its deliberations anew as opposed to the deliberating jurors simply informing the substituted juror of their respective positions . . . and then continuing deliberations from that point." Ibid. However, we must hew to the guidance in Ross that "[n]o bright line rule in respect of the length of jury deliberations triggers a finding that deliberations have progressed too far to permit the substitution of an alternate." 218 N.J. at 149 (quoting Williams, 171 N.J. at 169).

Here, in denying defendant's motion for a mistrial, the judge considered all relevant factors. We discern no abuse of discretion and defer to the judge's evaluation following his thorough voir dire that there was no taint, and conclusion that the reconstituted jury was able to engage in open and mutual deliberations after the substitution. The judge determined the relevant facts without compromising the integrity of the jury's deliberations, and meticulously followed the guidance provided in Ross. "In challenging circumstances, the [judge] ensured that defendant received a fair trial." Id. at 155.

IV.

In Point III, relying on extensive social science research on false confessions, defendant challenges "[t]he current model charge on statements made by defendants, which was given in this case," as "insufficient to instruct the jury as to the dangers of false confessions." According to defendant, "unlike the current Model Jury Charge On Identification, . . . the Model Charge on Statements provides absolutely no reference to any specific factors, much less any scientifically valid factors, for the jurors to employ in determining the credibility of the statement." Thus, defendant "proffers that the trial court . . . erred by . . . failing to recognize the inherent dangers relative to confession evidence, and . . . failing to properly charge the jury about the dangers of false confessions."

Because defendant did not object to the charge as given, or request any alternate or additional instruction on confessions during the charge conference, we review his contention for plain error and reverse "only if the error was 'clearly capable of producing an unjust result.'" State v. Ross, 229 N.J. 389, 407 (2017) (quoting R. 2:10-2). "The possibility of an unjust result must be 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" State v. Williams, 168 N.J. 323, 336 (2001) (quoting State v. Macon, 57 N.J. 325, 336 (1971)).

Here, we find no error, much less plain error. As defendant admits, the judge's instruction mirrored the Model Jury Charges (Criminal), "Statements of Defendant" (rev. Jun. 14, 2010). "It is difficult to find that a charge that follows the Model Charge so closely constitutes plain error." Moguli v. CB Commercial Real Estate Grp., Inc., 162 N.J. 449, 466 (2000). Moreover, any sua sponte deviation from the model jury charge by the judge may have undermined the defense strategy, which relied on the truth of defendant's confession. In fact, defense counsel repeatedly acknowledged the confession's veracity throughout the trial. In her opening statement, defense counsel stated that she was "not going to suggest" that defendant was not "responsible for his daughter's death, because he [was]. He took responsibility for it. He never blamed anyone else." She further explained, "[w]e're not here to tell you that he lied in his confession, he confessed to what happened." In her summation, she reiterated:

> The core of what you have to decide is really what my client's intentions were at the time that these events happened. Because as you have to be aware at this point, there's really no dispute concerning the fact that he caused the injury that caused her death[.] He confessed to it. He said he did it.

We also reject defendant's reliance on social science research and studies that were never presented to the judge or subjected to cross-examination by the State. Thus, there is no developed record for us to consider. See State v.

<u>Herrera</u>, 187 N.J. 493, 501 (2006) (declining to consider argument to expand law regarding identification evidence admissibility because the defendant failed to raise argument to trial court and failed to develop record incorporating current research).

V.

Defendant argues in Point IV that even if the individual errors "did not alone violate fundamental constitutional rights, in the aggregate these errors denied [him] a fair trial under the State and Federal Constitutions." <u>See</u> <u>State v. Orecchio</u>, 16 N.J. 125, 129 (1954) (holding that where "the legal errors are of such magnitude as to prejudice the defendant's rights or, in their aggregate have rendered the trial unfair, our fundamental constitutional concepts dictate the granting of a new trial before an impartial jury"). However, because we conclude there were no reversible errors, defendant's cumulative error argument must fail.

VI.

Finally, in Point V, defendant challenges his sentence "to the maximum life term" as "excessive and unduly punitive," arguing the judge's "methodology was flawed" and "exemplified prohibited double counting," mandating "a remand for resentencing." We disagree.

"Appellate review of the length of a sentence is limited." State v. Miller, 205 N.J. 109, 127 (2011). We will

> affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [State v. Fuentes, 217 N.J. 57, 70 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

In sentencing defendant on the murder conviction, the judge found aggravating factor one, "[t]he nature and circumstances of the offense, . . . including whether or not it was committed in an especially heinous, cruel[,] or depraved manner[,]" N.J.S.A. 2C:44-1(a)(1); aggravating factor two, "[t]he gravity and seriousness of harm inflicted . . . , including whether or not the defendant knew . . . that the victim . . . was particularly vulnerable or incapable of resistance due to . . . ill-health, or extreme youth," N.J.S.A. 2C:44-1(a)(2); aggravating factor three, "[t]he risk that the defendant will commit another offense[,]" N.J.S.A. 2C:44-1(a)(3); and aggravating factor nine, "[t]he need for deterring the defendant and others from violating the law[,]" N.J.S.A. 2C:44-1(a)(9). Based on the fact that defendant's two prior arrests did not result in convictions, the judge found mitigating factor seven, "[t]he defendant has no

history of prior delinquency or criminal activity[,]" N.J.S.A. 2C:44-1(b)(7). However, the judge "apportion[ed] so much weight to the vulnerability of the victim . . . and to the need to deter defendant and others, that [the] aggravating factors vastly outweigh[ed] [the] mitigating factor[.]"

Defendant challenges the judge's findings as to aggravating factors one and three. In finding aggravating factor one, the judge explained that "[t]he blows inflicted and the injuries caused by those blows, according to the evidence, were many more than the blows necessary to cause her death." The judge acknowledged that "[it was] not double counting" to consider "those extra blows" that defendant "reigned down upon [his daughter.]" Contrary to defendant's assertion, the judge's finding was supported by "competent credible evidence" in the record, State v. O'Donnell, 117 N.J. 210, 215 (1989), and did not constitute impermissible double counting. "[A] sentencing court may justify the application of aggravating factor one, without double-counting, by reference to the extraordinary brutality involved in an offense." Fuentes, 217 N.J. at 75.

In finding aggravating factor three, referring to defendant's admission that he struck his daughter out of anger, the judge queried:

> How can that risk [that defendant will commit another offense] be discounted when . . . defendant, in a murderous rage, killed his own flesh and blood? What evidence is there to detract from the proposition that, confronted once more with someone who [piques] his

anger, he will not lash out at them as well, violently. And therefore, there is the risk that he'll commit another offense.

The judge also pointed to the fact that "[defendant] expressed no remorse," and his "nonchalan[t]" attitude during police questioning "[was] astounding."

Defendant argues that the judge erred in finding aggravating factor three when he had "no prior indictable convictions and all other contacts with law enforcement resulted in dismissals." However, aggravating factor three "can be based on assessment of a defendant beyond the mere fact of a prior conviction, or even in the absence of a criminal conviction." State v. Thomas, 188 N.J. 137, 154 (2006). Moreover, "[a]dult arrests that do not result in convictions may be 'relevant to the character of the sentence . . . imposed.'" State v. Rice, 425 N.J. Super. 375, 382 (App. Div. 2012) (quoting State v. Tanksley, 245 N.J. Super. 390, 397 (App. Div. 1991)).

We are "bound to affirm a sentence, even if [we] would have arrived at a different result, as long as the trial court properly identifies and balances aggravating and mitigating factors that are supported by competent credible evidence in the record[,]" as occurred here. O'Donnell, 117 N.J. at 215. Accordingly, on this record, we discern no basis to intervene.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4452-14T1