**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0831-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

ANGEL E. CESAR,

     Defendant-Appellant.

_____

Submitted March 23, 2021 – Decided April 23, 2021

Before Judges Yannotti, Mawla and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 16-03-0203.

Joseph E. Krakora, Public Defender, attorney for appellant (Andrew R. Burroughs, Designated Counsel, on the briefs).

Lyndsay V. Ruotolo, Acting Union County Prosecutor, attorney for respondent (Milton S. Leibowitz, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant was tried before a jury and found guilty of first-degree possession of cocaine, with intent to distribute, in violation of N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(1), and other offenses. The trial judge sentenced defendant to an aggregate prison term of twenty-four years, with eight years of parole ineligibility. Defendant appeals from the judgment of conviction (JOC) dated September 28, 2018. We affirm.

I.

On March 11, 2016, a Union County grand jury returned an indictment charging defendant with: third-degree possession of a controlled dangerous substance (CDS) (cocaine), N.J.S.A. 2C:35-10(a)(1) (count one); first-degree possession of a CDS (cocaine) in a quantity of five ounces or more, with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(1) (count two); second-degree possession of a CDS (cocaine), with intent to distribute in or within 500 feet of a public park, N.J.S.A. 2C:35-7.1 (count three); third-degree possession of imitation CDS with intent to distribute, under circumstances that would lead a reasonable person to believe that the substance was a CDS, N.J.S.A. 2C:35-11(a) (count four); and second-degree eluding a law enforcement officer after having received a signal from such officer to bring his vehicle to a full stop, creating a risk of death or injury, N.J.S.A. 2C:29-2(b)

(count five).  Co-defendant Ariel Jazmin also was charged in counts one, two, three, and four.  In addition, Jazmin was charged with hindering a law enforcement officer from making an arrest, N.J.S.A. 2C:29-2(a) (count six).

At the trial, the State presented testimony, which established that on January 20, 2016, at approximately 8:00 p.m., law enforcement officers from the Union County Prosecutor's Office (UCPO) and the Linden Police Department conducted surveillance in the area of Park Avenue in Linden. Detective Filipe Afonso was in an unmarked vehicle.  He was accompanied by Sergeant William Mannix, the driver of the vehicle, and Detective Alex Lopez.

Detective Kevin Kolbeck was in an unmarked maroon GMC Yukon truck that was equipped with lights and sirens.  He was accompanied by Detectives Vito Colacitti and Maurice Rawlins.  Kolbeck parked his vehicle on Ingalls Avenue.  Detective Daniel Fay was in an unmarked black pickup truck equipped with police lights and sirens.  Lieutenant Jorge Jimenez was driving a Chevy Impala with a light package in the front.

At approximately 10:30 p.m., Kolbeck observed a black Chevy Suburban on Alberta Avenue, which was approximately three blocks from his surveillance location.  Kolbeck moved his vehicle to Hagel Avenue to obtain a better view

A-0831-18

of the Suburban. Shortly after 11:00 p.m., Afonso instructed Kolbeck and Fay to conduct a motor vehicle stop of the Suburban.

After the driver parked the Suburban on the side of the road, Kolbeck pulled up behind the vehicle and activated his lights. Fay positioned his vehicle in front of the Suburban. The Suburban then drove around Fay's vehicle and sped off toward Park Avenue, at approximately sixty-five to seventy miles per hour. Kolbeck followed the vehicle. Jimenez was stationed on Park Avenue at the time. He joined the pursuit behind Kolbeck's vehicle.

While he was following the Suburban, Kolbeck broadcasted his position over his police radio. The Suburban turned right and headed north on Park Avenue toward a park. When the Suburban drove through the intersection of Park and St. George's Avenue and entered the park, the driver of the Suburban lost control and crashed head on into a tree.

Kolbeck parked his vehicle behind the Suburban, and Colacitti and Rawlins got out. As the officers were exiting the vehicle, Jazmin jumped out of the Suburban and ran. Jimenez saw Jazmin discard an item that appeared to be a kilo of suspected narcotics. Kolbeck observed Jazmin running and gave chase, yelling "[p]olice, get on the ground." Jazmin did not comply.

 A-0831-18

Jimenez positioned his vehicle to cut off Jazmin's escape route. Kolbeck then tackled Jazmin and brought him to the ground. The officers arrested Jazmin and searched him for weapons. During the search, the officers found $325 in cash, keys, a watch, a necklace, and a pair of earrings. Jazmin was taken to a hospital.

The officers then searched the area where Jimenez saw Jazmin discard the item. An officer found the item and handed it to Jimenez, who gave it to Afonso. Meanwhile, Colacitti and Rawlins approached the passenger side of the Suburban. Colacitti said he could not see inside the vehicle because the windows were heavily tinted.

Colacitti used a tool to shatter the rear windows of the Suburban. While he was on the passenger side of the vehicle, Colacitti observed defendant extending his hands from the front passenger-side window. The officer grabbed defendant's hands.

According to Colacitti, defendant appeared to have been seated on the driver's side of the Suburban, and he was reaching across the vehicle toward the passenger-side window. Colacitti pulled defendant out of the Suburban. Rawlins handcuffed defendant and placed him under arrest. As Colacitti was

5

pulling defendant out of the vehicle, he observed an open, black duffle bag in the center console.

In the duffle bag, Colacitti found four rectangular-shaped packages, wrapped with brown tape. Each package weighed a kilogram. Colacitti testified that the packages each contained compressed powder formed into rectangular blocks. He said the contents were packaged to look like cocaine.

Colacitti and Rawlins searched defendant and recovered a set of keys, an iPhone, approximately $596 in cash, a New York driver's license, a Rolex watch, three gold chains, a ring, and diamond earrings. Because defendant complained about an injury to his leg, he was transported to a hospital.

The Suburban was later towed from the crash site. Afonso searched the vehicle. He found a coat, several telephones, a piece of jewelry, and a rock-like substance on the driver's seat. Later, Afonso transported the item that Jazmin had discarded, the packages found in the Suburban, and the rock-like substance to the UCPO's forensic laboratory, where they were tested by Margaret Cuthbert, a senior forensic chemist.

Cuthbert testified as an expert in the field of forensic chemistry and analysis of illegal narcotics. She stated that State's Exhibit 65 (S-65), the item that Jazmin had discarded and was referred to as Laboratory Item #001, weighed

1,021.7 grams, which is 36.03 ounces. She said the laboratory's machines are calibrated for weight daily.

Cuthbert further testified that S-65 was a solid, white substance with an off-white, sticky substance in one area in the center. She took samples from the sticky area and one of the corners. Both tested positive for cocaine. Cuthbert also performed tests on two additional samples. The test results showed cocaine was present in both samples.

Cuthbert later took five additional samples from S-65. The tests of these samples were consistent with cocaine. After Cuthbert determined cocaine was present in these five samples, she conducted an infrared test. The results of that test were positive for the presence of boric acid. She explained that boric acid is used in insecticides and other chemical manufacturing.

Cuthbert also testified about the results of the tests on the four packages recovered from the duffel bag. According to Cuthbert, the first weighed 1,076.8 grams, the second weighed 1,074.6 grams, the third weighed 1,077.7 grams, and the fourth weighed 1,097.5 grams. The tests of each package produced results that were consistent with the presence of boric acid.

Cuthbert also tested a sample taken from the rock-like substance recovered from the driver's seat of the Suburban. She said it weighed 4.235

A-0831-18

grams and cocaine was present in the sample. She stated that all of her findings were within a reasonable degree of scientific certainty.

Sergeant Gary Webb of the UCPO testified for the State as an expert in the field of packaging, handling, and distribution of narcotics. Webb provided testimony about pricing and packaging of narcotics. He discussed the differences between street, mid-level, and upper-level drug dealers, how kilos of narcotics and other substances are formed, the use of cutting agents, and methods drug dealers use to avoid detection.

Webb also described boric acid as a white powder. He stated that by adding boric acid as a cutting agent, drug distributors can increase the amount of the drugs they sell and thereby increase their profit margin.

Defendant and Jazmin elected not to testify. Neither defendant presented any witnesses.

On April 12, 2018, the attorneys provided closing statements, and the trial judge provided final instructions to the jury. On the morning of April 17, 2018, the jury began its deliberations. During their deliberations, jurors found two single-edge razor blades inside the pocket of defendant's jacket. The jacket had been admitted into evidence, but the razor blades had not been admitted or

marked as evidence. The judge conferred with the attorneys and they agreed upon an instruction the judge would provide to the jury.

The judge then told the jurors "the only evidence that you may consider is the [evidence] that's been brought [to your attention] and is labeled with exhibits. If anything . . . for any inadvertent reason was brought in and taken away, you shouldn't consider it." Thereafter, defendants' attorneys objected to the instruction. The jury continued its deliberations.

Later, the judge excused a juror. On the morning of April 18, 2018, the judge replaced the excused juror with an alternate and instructed the jury to begin its deliberations anew.

The jury continued to deliberate and later that morning, returned its verdict. The jury found defendant and Jazmin guilty on counts one, two, and four, and not guilty on count three. In addition, defendant was found guilty on count five, and Jazmin was found guilty on count six. Thereafter, the judge later denied defendants' motion for a judgment of acquittal, notwithstanding the verdict.

The judge sentenced defendant on September 14, 2018, and entered the JOC. This appeal followed.

9

On appeal, defendant raises the following arguments for our consideration:

POINT I
CERTAIN EVIDENTIARY RULINGS BY THE TRIAL COURT EFFECTIVELY DENIED DEFENDANT HIS SIXTH AMENDMENT RIGHT TO PRESENT A COMPLETE DEFENSE. (Raised Below).

A. BY GRANTING THE STATE'S MOTION TO LIMIT TESTIMONY AND ARGUMENT BY THE DEFENSE AND BY FURTHER DENYING DEFENDANT'S APPLICATION THAT A QUANTITATIVE ANALYSIS BE PERFORMED ON S-65, THE TRIAL COURT DENIED DEFENDANT'S SIXTH AMENDMENT RIGHT TO PRESENT A COMPLETE DEFENSE. (Raised Below).

B. THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANT'S MOTION TO ADMIT HIS INCULPATORY STATEMENT UNDER N.J.R.E. 803(c)(25). (Raised Below).

POINT II
THE TRIAL COURT ERRED WHEN IT ACCEPTED THE HEARSAY TESTIMONY OF THE STATE'S EXPERT THAT THE LABORATORY WHERE THE DRUGS HAD BEEN ANALYZED HAD BEEN ACCREDITED AND THAT THE MACHINES USED TO ANALYZE AND WEIGH THE SEIZED CONTRABAND HAD BEEN PROPERLY CALIBRATED AND MAINTAINED. (Raised Below).

POINT III

A-0831-18

THE TRIAL COURT ERRED WHEN IT ADMITTED DETECTIVE WEBB'S IMPERMISSIBLE NET OPINION TESTIMONY.  (Raised Below).

POINT IV
AS JURY DELIBERATIONS HAD LIKELY PROGRESSED TO A STAGE AT WHICH SUBSTANTIVE ISSUES HAD BEEN DECIDED AND DELIBERATIONS COULD NOT COMMENCE ANEW, THE TRIAL COURT ERRED BY SUBSTITUTING AN EXCUSED JUROR AND BY NOT SUA SPONTE DECLARING A MISTRIAL. (Partially Raised Below).

POINT V
AS THE TRIAL COURT'S LIMITING INSTRUCTION WAS INSUFFICIENT TO CURE THE UNDUE PREJUDICE CAUSED BY THE JURY'S DISCOVERY OF RAZOR BLADES IN DEFENDANT'S JACKET DURING DELIBERATIONS, A MISTRIAL WAS THE ONLY REMEDY.  (Raised Below).

POINT VI
THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL NOTWITHSTANDING THE VERDICT.  (Raised Below).

POINT VII
THE TRIAL COURT'S CUMULATIVE ERRORS DENIED DEFENDANT HIS RIGHT TO A FAIR AND RELIABLE TRIAL.  (Not Raised Below).

POINT VIII
THE SENTENCE IMPOSED IS UNFAIR AND EXCESSIVE GIVEN THE UNIQUE CIRCUMSTANCES OF THIS CASE.  (Raised Below).

11

II.

Defendant argues that the trial judge made several erroneous evidentiary rulings. He contends the judge's rulings denied him of his right under the Sixth Amendment to the United States Constitution to present a complete defense.

A trial court's evidentiary rulings should not be disturbed on appeal "absent a showing of an abuse of discretion, i.e., there has been a clear error of judgment." State v. Perry, 225 N.J. 222, 233 (2016) (emphasis omitted) (quoting State v. Brown, 170 N.J. 138, 147 (2001)). We will not reverse the trial court's evidentiary ruling unless it "was so wide of the mark that a manifest denial of justice resulted." Ibid. (quoting State v. Marrero, 148 N.J. 469, 484 (1997)). This standard of review applies when, as in this case, a defendant contends a trial court's evidentiary ruling denied him of his constitutional right to present a defense. Ibid. (citing State v. Fortin, 178 N.J. 540, 590 (2004)).

A. The Trial Court's Rulings Regarding S-65.

Prior to trial, defendants filed a motion to have S-65 retested. The motion judge granted the application. Thereafter, the UCPO's forensic laboratory took two samples from the exhibit and retested it in the presence of defendants' expert. They tested positive for cocaine. Defendants later filed another motion seeking further testing of five more samples from S-65. The judge granted the

motion and the UCPO's lab conducted the additional tests. The results of these tests also were positive for cocaine.

Defendants then filed a motion seeking an analysis of S-65 to determine the amounts of cocaine and boric acid in the exhibit. The motion judge denied the application. In his decision, the judge noted that defendant had been charged with first-degree possession of a CDS, with intent to distribute or dispense, in a quantity of five ounces or more, including any "adulterants or dilutants."

The judge found that the quantities of cocaine and boric acid in S-65 were irrelevant. The judge noted that "purity" of the cocaine was not an element that the State had to prove to establish defendants' guilt under N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(1).

In addition, the State filed a motion in limine to bar defendants from presenting any testimony or argument at trial concerning the percentage or quantity of cocaine and boric acid in S-65, including the specific purity of the cocaine; the unknown percentage or quantity of the cocaine and boric acid in S-65, and why a quantitative test had not been performed on the exhibit. The State also sought to bar defendants from speculating as to what such a quantitative test would have revealed, and arguing to the jury that S-65 only contained a small amount of cocaine.

13

The trial judge granted the State's motion. Like the motion judge, the trial judge found there is "no purity element" in the charge under N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(1). The judge again determined that the relative amounts of cocaine and boric acid in the exhibit were not relevant to determining whether defendants were guilty of that offense.

On appeal, defendant argues that the jury should have been informed about the "weight ratio" of the cocaine and boric acid in S-65. He asserts that if S-65 contained a small amount of cocaine relative to the amount of boric acid, this would have supported defendants' argument that S-65 was a "sample package" that defendants intended to use to encourage the buyer to purchase the four packages of boric acid.

Defendant contends that, by denying defendants' motion for a quantitative analysis of S-65, and granting the State's motion in limine, the judge effectively denied him of his constitutional right to present a complete defense to the intent element of N.J.S.A. 2C:35-5. We disagree.

N.J.S.A. 2C:35-5(a)(1) provides in pertinent part that except as authorized by N.J.S.A. 24:21-1 to -56, it is unlawful for any person "knowingly or purposely . . . to possess or have under his control with intent to . . . distribute

or dispense, a [CDS] or controlled substance analog."  Furthermore, N.J.S.A. 2C:35-5(b)(1) states that a person who violates N.J.S.A. 2C:35-5(a) as to

> (1) [h]eroin, or its analog, or coca leaves and any salt, compound, derivative, or preparation of coca leaves, and any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances, or analogs, except that the substances shall not include decocainized coca leaves or extractions which do not contain cocaine or ecogine, or 3,4-methylenedioxymethamphetamine or 3,4-methylenedioxyamphetamine, in a quantity of five ounces or more including any adulterants or dilutants is guilty of a crime of the first degree.
>
> [(Emphasis added).]

Here, the judges correctly found that under N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(1), the determination of whether a defendant possessed cocaine "in a quantity of five ounces or more including any adulterants or dilutants" does not turn on the relative weights of the cocaine and any "adulterants or dilutants."  The judge's decisions on this issue were consistent with State v. Gosa, 263 N.J. Super. 527, 536 (App. Div. 1993), where we held that under N.J.S.A. 2C:35-5(b)(1), the weight of the CDS for violations of N.J.S.A. 2C:35-5 includes the weight of the "listed drug" and "any adulterants or dilutants."

15

Therefore, the judges correctly found that the relevant weight of the CDS and any "adulterant or dilutant" has no bearing on whether the defendant is guilty of the offense.  See also State v. Williams, 310 N.J. Super. 92, 96-97 (App. Div. 1998) (holding N.J.S.A. 2C:35-5(b) prohibits the possession of the specified quantity "of cocaine and any adulterants, not just the weight of the cocaine itself").

Accordingly, we reject defendant's contention that the trial judge denied him of the right to present a complete defense as to whether he "knowingly or purposely" possessed the cocaine, as charged in count two.  We note that no evidence was presented at trial that would have allowed the jury to draw the inference that defendants possessed S-65 to use as a sample in selling the four kilos of imitation cocaine the officers found in the Suburban.

B.  Admission of Defendants' Statements.

Prior to trial, defendants filed a motion for permission to admit two out-of-court statements they made during their encounters with the police. Defendant told the officers the contents of the packages they had recovered were "fake."  In addition, Jazmin asked the officers, "[w]hat's the penalty for selling fake drugs?"  The judge denied the motion.

On appeal, defendant contends the statements were admissible under <u>Rule</u> 803(c)(25), the hearsay exception for statements against interest, which applies "regardless of whether the declarant is available as a witness." N.J.R.E. 803(c)(1). At the time of trial, <u>Rule</u> 803(c)(25) allowed the introduction of:

> A statement that a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary, pecuniary or social interest, or had so great a tendency to invalidate the declarant's claim against another or to expose the declarant to civil or criminal liability. Such a statement is admissible against a defendant in a criminal proceeding only if the defendant was the declarant.[1]

Defendants' statements did not qualify for admission under the rule. They may have been statements against interest regarding the possession of four kilos

---

[1] Effective July 1, 2020, <u>Rule</u> 803(c)(25) provides:

> A statement which was at the time of its making so far contrary to the declarant's pecuniary, proprietary, or social interest, or so far tended to subject declarant to civil or criminal liability, or to render invalid declarant's claim against another, that a reasonable person in declarant's position would not have made the statement unless the person believed it to be true. Such a statement is admissible against a defendant in a criminal proceeding only if the defendant was the declarant.

17

of imitation cocaine, as charged in count four, but they were not statements against interest as to the possession of cocaine, as charged in count two.

We are convinced that a statement indicating that an individual may have committed a third-degree crime, while simultaneously indicating that the individual did not commit a more serious offense, is not a statement against interest for purposes of Rule 803(c)(25). The judge correctly found that the statements were not admissible.

We are also convinced that if the statements were statements against interest under Rule 803(c)(25), the judge properly exercised his discretion under Rule 403 by precluding defendants from admitting them into evidence. The rule provides that the court can exclude "relevant evidence if its probative value is substantially outweighed by the risk of: (a) [u]ndue prejudice, confusing the issues, or misleading the jury . . . ." N.J.R.E. 403.

Here, the trial judge found that, if admitted, the statements would confuse the jury because they were inculpatory as to the charge of possession of imitation cocaine with intent to distribute, but exculpatory as to the possession of five ounces or more of cocaine. The judge's decision was not a mistaken exercise of discretion.

However, if the judge erred by precluding defendant from admitting the two statements, the error was harmless. Here, the State presented significant, if not overwhelming, evidence that defendants knowingly and purposely possessed, with intent to distribute or dispense, five ounces or more of cocaine "and any adulterant or dilutant" as well as four kilos of imitation cocaine.

The statements defendants sought to admit would have provided additional evidence that defendants possessed the imitation cocaine but would have had no impact on the other, more serious charge. Thus, if the trial judge erred by denying defendant's motion to admit the statements, the error was not "clearly capable of producing an unjust result." R. 2:10-2.

### III.

Defendant next argues that the trial judge erred by allowing Cuthbert to testify about the results of her analysis of the contraband. Defendant contends the State failed to present documents establishing that the UCPO's forensic laboratory was accredited, and that the machines used to test the contraband were properly maintained and calibrated. Defendant asserts the judge improperly permitted Cuthbert to testify as to the lab's accreditation and the calibration of the machinery.

A-0831-18

When a party in a criminal or quasi-criminal matter intends to proffer a certificate regarding tests of the composition, quality, or quantity of a substance, the party must provide notice of its intent "at least [twenty] days before the proceeding begins." N.J.S.A. 2C:35-19. The opposing party must provide notice of its intent to object, and the grounds of the objection, within ten days after receiving notice of the party's intent to proffer the certificate. N.J.S.A. 2C:35-19(c). If a notice of objection is filed, the court must determine the admissibility of the certificate not later than two days before the beginning of the proceeding. Ibid.

Here, the State provided defendants with a laboratory report pertaining to Cuthbert's analysis of the contraband, and defendants filed a notice of objection to its admission. The notice did not, however, indicate that defendants intended to challenge the report on the basis of the lab's lack of accreditation or the failure to calibrate the machinery used in the tests. Defendants' attorneys also did not seek copies of any records on those issues.

Defendants raised the issue for the first time at trial during Cuthbert's voir dire. The judge then conducted a Rule 104 hearing, outside the presence of the jury. During the hearing, Cuthbert testified that she has been a forensic scientist

20

in the UCPO's laboratory for thirty-four years and she holds the title of senior forensic chemist.

Cuthbert stated that the UCPO's laboratory was accredited. She admitted she does not personally calibrate the spectrometers used in the lab but said these instruments and weights are calibrated. The judge ruled that Cuthbert's testimony regarding her tests of the contraband was admissible. Then, Cuthbert testified before the jury that the laboratory was accredited, and the scientists calibrate the lab's machinery every day.

On appeal, defendant contends the admission of Cuthbert's testimony regarding the accreditation of the laboratory and the calibration of the machines denied him of his constitutional right to confront adverse witnesses. We disagree.

A person charged with a criminal offense has the right to confront his accusers. U.S. Const. amend. VI. "This right is founded on the belief that subjecting testimony to cross-examination enhances the truth-discerning process and the reliability of the information." State v. Kuropchak, 221 N.J. 368, 386 (2015) (citing California v. Green, 399 U.S. 149, 159 (1970); State ex rel. J.A., 195 N.J. 324, 342 (2008)). The Confrontation Clause generally forbids the admission of testimony that is directly or indirectly derived from a non-

21

testifying witness and incriminates a defendant. State v. Branch, 182 N.J. 338, 350 (2005).

Rule 703 states that if the data upon which an expert bases an opinion or inference is "reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." The rule permits expert witnesses to rely upon statements in "nontestimonial foundational documents" when formulating their opinions. State v. Michaels, 219 N.J. 1, 34-35 (2014).

Documents related to a laboratory's accreditation and the calibration of its test machines are "nontestimonial foundational documents" because they do not report past facts and are not generated in order to establish a fact that is an element of an offense. See State v. Chun, 194 N.J. 54, 142-44 (2008); see also State v. Sweet, 195 N.J. 357, 372-74 (2008).

In this case, the State did not present the foundational documents pertaining to the accreditation of the lab and the calibration of the machinery. However, in her testimony, Cuthbert provided essentially the same facts that would have been established by those certificates. The record shows she had personal knowledge of those facts, based on her long-term employment in the

UCPO's laboratory. Cuthbert properly relied upon those facts in formulating her opinions.

In support of his argument that the judge erred by allowing Cuthbert's expert testimony, defendant relies upon State v. Miller, 170 N.J. 417 (2002). In that case, the defendant was indicted for possession of a CDS, and the State Police Forensic Science Bureau certified that the substance was cocaine. Id. at 422. The State notified defense counsel of its intent to proffer the laboratory certificate pertaining to the analysis instead of a witness, pursuant to N.J.S.A. 2C:35-19(c). Ibid. The judge admitted the certificate. Id. at 424.

The Court explained that the purpose of N.J.S.A. 2C:35-19 is to "put the State on notice of those cases in which a defendant will not consent to the admission of the lab report and with respect to which the State must be prepared to produce an expert witness at trial or prove why one is not necessary." Id. at 432. The statute requires the defendant "to notify the State of his [or her] refusal to stipulate to the lab report and to assert that the lab results (composition, quality or quantity of the tested substance) will be contested at trial." Ibid. The defendant is not required to detail an objection to the admission of the lab certificate. Id. at 436. The Court held that, as so interpreted, the statutory procedure passes constitutional muster. Ibid.

In this case, defendants filed a notice indicating they were objecting to the admission of the State's lab certificate and would be contesting the composition, quality, and quantity of the tested substances. Accordingly, consistent with Miller, the State presented Cuthbert as an expert witness to address the objection and testify as to her tests of the contraband and the test results.

As noted, under Rule 703, an expert witness may rely upon facts in nontestimonial foundational documents when formulating an opinion. Michaels, 219 N.J. at 34-35. Miller does not preclude the State's expert witness from testifying to those facts, based on the expert's personal knowledge and experience, as part of the testimony addressing an objection to the admission of the lab certificate regarding the test results. Therefore, defendant's reliance upon Miller is misplaced.

IV.

Defendant further argues that the judge erred by permitting Detective Webb to testify at trial. Defendant contends Webb's report set forth inadmissible net opinions.

In this case, defendants filed a motion to bar Webb's testimony, arguing that his expert report contained nothing but conclusions. Defendants contended

that Webb had not provided a methodology for his opinions, and they challenged his qualifications.  The judge denied the motion.

The decision of whether to admit or exclude expert testimony is committed to the discretion of the trial court.  State v. Berry, 140 N.J. 280, 293 (1995).  "The trial court has discretion in determining the sufficiency of the expert's qualifications 'and [its decision] will be reviewed only for manifest error and injustice.'"  State v. Torres, 183 N.J. 554, 572 (2005) (quoting State v. Ravenell, 43 N.J. 171, 182 (1964)).

"An expert is one who is qualified 'by knowledge, skill, experience, training, or education' and who is therefore permitted to offer testimony in the form of an opinion that 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'"  State v. McLean, 205 N.J. 438, 449 (2011) (quoting N.J.R.E. 702).  Under Rule 702, expert testimony may be admitted if: (1) it concerns "a subject matter that is beyond the ken of the average juror;" (2) the testimony pertains to a field which is at a "state of the art such that an expert's testimony could be sufficiently reliable"; and (3) the witness has "sufficient expertise to offer the intended testimony."  Creanga v. Jardal, 185 N.J. 345, 355 (2005) (quoting Kemp ex rel. Wright v. State, 174 N.J. 412, 424 (2002)).

A-0831-18

The net opinion rule is a corollary of Rule 703 and precludes "the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data." Polzo v. Cnty. of Essex, 196 N.J. 569, 583 (2008) (quoting State v. Townsend, 186 N.J. 473, 494 (2006)). The rule "requires an expert to give the why and wherefore of his or her opinion, rather than a mere conclusion." Ibid. (quoting Townsend, 186 N.J. at 494).

Our courts have permitted law enforcement officers to testify as expert witnesses in drug cases because "the average juror is not knowledgeable about the arcana of drug-distribution schemes." State v. Cain, 224 N.J. 410, 426 (2016). "Law enforcement officers with extensive training, education, and experience of the drug world have 'specialized knowledge [that] will assist the trier of fact to understand the evidence or to determine a fact in issue.'" Ibid. (quoting N.J.R.E. 702).

Here, the trial judge did not err by permitting Webb's testimony. Based on his extensive experience in law enforcement, Webb was properly qualified as an expert in the packaging, handling, and distribution of illegal narcotics.

The judge noted that Webb was "familiar with the manner in which [CDS] are used, packaged and distributed at the street, mid and upper levels as well as the structured criminal street gangs and their activities including but not limited

to drug distribution." Moreover, Webb's testimony did not run afoul of the net opinion rule. Webb provided a sufficient factual basis for his opinions.

On appeal, defendant argues that Webb improperly offered an opinion as to the relationship between a person's expensive jewelry and drug distribution. The record shows, however, that Webb did not provide such an opinion at trial.

Defendant also contends the judge erred by permitting Webb to respond when the assistant prosecutor asked, "[i]n your experience, how much cocaine would you expect somebody that's using cocaine to purchase?" Defendant argues that Webb did not address this issue in his report.

"[A] trial judge has the discretion to preclude expert testimony on a subject not covered in the written reports furnished in discovery." Ratner v. General Motors Corp., 241 N.J. Super. 197, 202 (App. Div. 1990). Here, the judge found that the issue was sufficiently identified in Webb's expert report, and defendants were on notice that Webb would address the question of the amount of cocaine a person might possess for personal use. The judge's ruling was not a mistaken exercise of discretion.

## V.

Defendant also contends the trial judge erred by substituting a juror during deliberations after a juror was excused. He argues that the jury's deliberations

27

had proceeded to a point where substitution was not a permissible remedy and a mistrial was required. We do not agree.

A trial court's decision to remove and substitute a deliberating juror because of an inability to continue pursuant to Rule 1:8-2(d)(1) is reviewed for abuse of discretion. State v. Musa, 222 N.J. 554, 564-65 (2015). When a trial judge excuses a juror after deliberations have begun and substitutes an alternate juror, "the court shall instruct the jury to recommence deliberations . . . ." Rule 1:8-2(d)(1). Before making the substitution, the trial court must "consider[] whether the jury appears to have progressed to the point where issues have been decided and deliberations cannot commence anew with a substituted juror." State v. Terrell, 452 N.J. Super. 226, 274 (App. Div. 2016) (citing State v. Ross, 218 N.J. 130, 151 (2014)).

In making that decision, the trial court must consider the impact the juror's substitution will have "on the jury process." Ross, 218 N.J. at 147. If a substitution of a juror would "imperil the integrity of the jury's process . . . [t]he court must be prepared to declare a mistrial." Ibid. Granting a mistrial in these circumstances is, however, "an extraordinary remedy to be exercised only when necessary 'to prevent an obvious failure of justice.'" State v. Yough, 208 N.J. 385, 397 (2011) (quoting State v. Harvey, 151 N.J. 117, 205 (1997)). There is

28

no "bright line rule" with respect to the length of jury deliberations that would trigger a finding that deliberations are too far along to substitute an alternate juror. Ross, 218 N.J. at 149 (quoting State v. Williams, 171 N.J. 151, 169 (2002)).

In deciding whether a reconstituted jury can render a just verdict, the court must consider, among other things, "the timing of the juror's departure, his or her explanation of the problem prompting the inquiry, and any communications from the jury that may indicate whether deliberations have progressed to the point at which a reconstituted and properly charged jury will be unable to conduct open and mutual deliberations." Ibid. The court also must consider "whether the original jurors had formed opinions about the case in the absence of the alternate juror . . . ." State v. Williams, 377 N.J. Super. 130, 149 (App. Div. 2005) (quoting People v. Roberts, 214 Ill. 2d 106, 124 (2005)).

As stated previously, on April 12, 2018, the judge provided his final instructions to the jury. The proceedings resumed on the morning of April 17, 2018, and the jury began its deliberations. During the deliberations, a juror informed the judge that she had an appointment for pre-surgery clearance the following day at 2:00 p.m. and she needed to leave by 1:00 p.m.

A-0831-18

The juror also informed the judge that her surgery was scheduled for April 19, 2018. The judge discussed the matter with counsel and asked them for their views on how to proceed. The attorneys agreed the judge should ask the juror what she wanted to do. The juror asked to be excused, and the judge granted the request. Defendants did not object.

The following day, April 18, 2018, the judge substituted an alternate juror and instructed the reconstituted jury to begin its deliberations anew. The reconstituted jury returned its verdict that day. The record indicates that both the initial jury and the reconstituted jury deliberated for several hours.

We are convinced that, under the circumstances, the judge did not err by substituting the juror with an alternate and allowing the reconstituted jury to begin its deliberations anew. We reject defendant's contention that the "most likely scenario" was that the new jury simply adopted findings made by the initial jury on the drug counts and then deliberated only on the eluding charges. Defendant's assertion is not supported by the record.

We also reject defendant's contention that the reconstituted jury was not able to discuss and consider each count of the indictment thoughtfully. There is no evidence in the record indicating that the deliberations by the new jury were

A-0831-18

"illusory." The initial jury had sent three questions to the judge, including a request to playback a video, which the new jury also requested.

Moreover, as noted, the judge instructed the jurors they must start their deliberations anew. The judge told the members of the original deliberating jury they must set aside and disregard what may have occurred during the earlier deliberations. The judge instructed the reconstituted jury it must consider all of the evidence presented during the trial.

The record shows the initial jury did not proceed to a point of deliberations where substituting the excused juror with an alternate was not a proper remedy. The judge was not required to declare a mistrial. Accordingly, we reject defendant's contention that he was denied of his right to a fair and reliable trial.

VI.

Defendant argues that the trial judge erred by refusing to declare a mistrial after the jury discovered razor blades in the pocket of his jacket during deliberations. He contends the judge's instruction was insufficient to cure the prejudice resulting from the jury's discovery of the razor blades. Again, we disagree.

The trial judge has the obligation to ensure that the jury's impartiality is not significantly threatened by the jury's exposure to "contact with not-record

facts." State v. Wakefield, 190 N.J. 397, 485-86 (2007) (quoting State v. Loftin, 146 N.J. 295, 365 (1996)).  Under these circumstances, the trial judge has the power to grant a mistrial, but this power "is to be exercised with the greatest caution."  State v. Winter, 96 N.J. 640, 647 (1984) (quoting State v. Witte, 13 N.J. 598, 611 (1953)).  "Unless the vice is plainly ineradicable by an instruction to the jury, a mistrial is not allowable of right."  Ibid. (quoting Witte, 13 N.J. at 611).

The trial judge also has the discretion to determine "whether the appropriate response is a curative instruction, as well as the language and detail of the instruction . . . [because] the trial judge . . . 'has the feel of the case and is best equipped to gauge the effect of a prejudicial comment on the jury in the overall setting.'"  Wakefield, 190 N.J. at 486 (quoting Winter, 96 N.J. at 647). "The adequacy of a curative instruction necessarily focuses on the capacity of the offending evidence to lead to a verdict that could not otherwise be justly reached."  Winter, 96 N.J. at 647.

The record shows that on April 17, 2018, after the jury began deliberating, the jury notified the sheriff that razor blades had been found in the pocket of defendant's jacket.  The judge conferred with counsel and they agreed upon a limiting instruction.  The judge accordingly instructed the jury that:

The [jury] room is supposed to be clear and clean and empty. Not decorated, and just simple so that [the] only things that are in there is the evidence that's brought in, and your collective memory of what you understood and heard happened.

So the only evidence that you may consider is the stuff that's been brought in to you, and is labeled with exhibits. If anything . . . for any inadvertent reason was brought in and taken away, you shouldn't consider it. And the fact of any of it shouldn't even exist. That big eraser that we talked about, [whenever] I would do objections, and if I were to sustain it, I'd ask you to just take the eraser and erase.

I'm trusting and counting and knowing, confidently that you guys can do that. Because every time I did the eraser move, you guys seemed to follow it. And that's what we're doing right now.

So if by any chance anything was brought in inadvertently, and had to be taken away, please disregard it with the big eraser. And I just charge you and trust you, and I'm fully confident in you[r] guys' ability to . . . take that instruction to heart, and to apply it, please.

The judge did not mistakenly exercise his discretion by electing to address the discovery of the razor blades with a curative instruction. The instruction addressed any potential for undue prejudice that might arise from the discovery of the razor blades. The judge instructed the jurors that in reaching their verdict, they were only to consider evidence admitted during the trial. The judge's instruction was firm, clear, and provided promptly. A mistrial was not required.

33

Defendant argues, however, that the discovery of the razor blades undercut his defense that the police had opened S-65 and either planted or contaminated the exhibit with cocaine. The contention is entirely without merit.

As noted, the judge instructed the jury to disregard the razor blades and decide the case based solely on the evidence admitted during the trial. We must presume the jury followed the judge's instructions. State v. Martini, 187 N.J. 469, 477 (2006) (citing State v. Marshall, 173 N.J. 343, 355 (2002)).

VII.

Defendant contends the judge erred by denying his motion for a judgment of acquittal notwithstanding the verdict. We disagree.

In the trial court, defendants argued that the motion should have been granted because the jury's discovery of the razor blades was unduly prejudicial, and the judges' instruction was insufficient. They also argued that the State failed to prove that defendants intended to distribute cocaine. Defendants contended that the evidence showed they intended to "bait" a prospective drug dealer with a brick laced with cocaine, and then switch the "laced" package with the bricks of boric acid. The judge denied the motion.

In reviewing the trial court's decision on a motion for a judgment of acquittal, we apply the same standard the trial court must apply in ruling on the

34

motion.  State v. Fuqua, 234 N.J. 583, 590 (2018) (citing State v. Sugar, 240

N.J. Super. 148, 153 (App. Div. 1990)).  Like the trial court, we must determine:

> Whether the evidence viewed in its entirety, and giving the State the benefit of all of its favorable testimony and all of the favorable inferences which can reasonably be drawn therefrom, is such that a jury could properly find beyond a reasonable doubt that the defendant was guilty of the crime charged.
>
> [State v. D.A., 191 N.J. 158, 163 (2007) (citing State v. Reyes, 50 N.J. 454, 458-59 (1967); R. 3:18-1).]

We are convinced that viewing the evidence in its entirety and giving the

State the benefit of all favorable testimony and inferences, the jury could have

found, beyond a reasonable doubt, that defendant was guilty of the offenses

charged in counts one, two, four, and five.  As we noted previously, the judge's

curative instruction was sufficient to address any undue prejudice that could

have resulted from the discovery of the razor blades.  Moreover, the State

presented substantial, if not overwhelming evidence, that defendant intended to

distribute cocaine.  We therefore conclude the judge did not err by denying

defendant's motion for a judgment of acquittal.

Defendant's other arguments on this issue lack sufficient merit to warrant

further discussion.  R. 2:11-3(e)(2).

A-0831-18

VIII.

Defendant contends the cumulative error doctrine requires reversal of his convictions. Again, we disagree.

Under the cumulative error doctrine, the court may reverse a defendant's conviction when "any one of several errors assigned would not in itself be sufficient to warrant a reversal, yet if all of them taken together justify the conclusion that defendant was not accorded a fair trial . . . ." State v. Terrell, 452 N.J. Super. 226, 308 (App. Div. 2016) (quoting State v. Orecchio, 16 N.J. 125, 134 (1954)). In this matter, we have rejected all of defendant's claims of error. Therefore, the cumulative error doctrine does not apply.

IX.

Defendant argues that the sentence imposed by the trial court is excessive and unfair. We disagree.

Here, the judge found aggravating factors three, N.J.S.A. 2C:44-1(a)(3) (risk that defendant will commit another offense); six, N.J.S.A. 2C:44-1(a)(6) (extent of the defendant's prior criminal record and the seriousness of the offenses); and nine, N.J.S.A. 2C:44-1(a)(9) (need to deter defendant and others from violating the law). The judge found no mitigating factors.

The judge merged counts one (third-degree possession of CDS) with count two (first-degree possession of CDS with intent to distribute or dispense), and sentenced defendant on count two to a sixteen-year prison term, with eight years of parole ineligibility. The judge also sentenced defendant to a concurrent four-year prison term on count four (third-degree possession of imitation CDS), and a consecutive eight-year term on count five (second-degree resisting arrest/eluding).

On appeal, defendant contends the aggregate sentence of twenty-four years of imprisonment, with eight years of parole ineligibility, is manifestly unfair and excessive "given the unique facts of this case." He contends the imposition of a fifty percent parole disqualifier on count two was excessive.

Defendant again argues the trial judge denied him of an opportunity to present a complete defense. He asserts the judge improperly commented on the damage caused when the Suburban crashed into the tree. He also contends the judge failed to analyze whether a consecutive sentence should be imposed in accordance with the guidelines in State v. Yarbough, 100 N.J. 527, 643-44 (1985).

We review the trial court's sentencing determinations "in accordance with a deferential standard." State v. Fuentes, 217 N.J. 57, 70 (2014). "The

reviewing court must not substitute its judgment for that of the sentencing court." Ibid. Therefore, this court:

> [M]ust affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [Ibid. (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

We are convinced that the record supports the judge's finding of aggravating factors and his determination that no mitigating factors applied. We again note that the judge did not deny defendant of his right to present a complete defense. In addition, the judge's comment regarding the tree was not a significant factor in the judge's sentencing determination.

We also find no merit to defendant's contention that the judge erred by imposing a consecutive sentence on count five. Trial judges have discretion to determine if a sentence should be concurrent or consecutive. State v. Cuff, 239 N.J. 321, 350 (2019).

When deciding whether to impose concurrent or consecutive sentences, the court considers the following guidelines established in Yarbough, 100 N.J. at 643-44:

(1) there can be no free crimes in a system for which the punishment shall fit the crime;

(2) the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision;

(3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:

> (a) the crimes and their objectives were predominantly independent of each other;
>
> (b) the crimes involved separate acts of violence or threats of violence;
>
> (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;
>
> (d) any of the crimes involved multiple victims;
>
> (e) the convictions for which the sentences are to be imposed are numerous;

(4) there should be no double counting of aggravating factors;

(5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense . . . .[2]

---

[2] Yarbough included a sixth guideline placing an "outer limit" on the cumulation of consecutive sentences. Id. at 644. This guideline was eliminated by an amendment to N.J.S.A. 2C:44-5(a) enacted in 1993. L. 1993, c. 223.

A-0831-18

Here, the judge stated that under Yarbough, a consecutive sentence was warranted because there are "no free crimes" in our system of justice. The judge noted that the possession of the cocaine and imitation cocaine was "one thing," but operating the car to elude the police was "an independent act." The judge found that a consecutive sentence was warranted for this separate, independent offense.

On appeal, defendant argues that the judge misapplied Yarbough and erred by imposing a consecutive sentence because his initial flight from the police was likely the product of confusion and fear. He contends the pursuing officers appeared suddenly in unmarked cars, forcing him to stop and blocking his escape.

Defendant asserts his flight from the police was "an extension" of the underlying offense of distribution of a CDS. He claims the offenses were predominately interrelated and not independent. He contends the sentences on counts two and five should have run concurrently.

We are convinced, however, that the judge properly considered the Yarbough factors, and the record supports the judge's finding that defendant's flight from the police, and the manner in which it was undertaken, was a separate and independent offense for which a consecutive sentence was appropriate. The

40

judge aptly noted that under <u>Yarbough</u>, "there can be no free crimes in a system for which the punishment shall fit the crime . . . ." <u>Id.</u> at 644.

We conclude the judge's imposition of a consecutive sentence was not a mistaken exercise of discretion, and the resulting aggregate sentence was not excessive or unfair.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0831-18